# United States Court of Appeals
## For the First Circuit

No. 14-1879

UNITED STATES OF AMERICA,

Appellee,

v.

VINCENT F. CASTRO-TAVERAS,

Defendant, Appellant.

---

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

[Hon. Salvador E. Casellas, U.S. District Judge]

---

Before

Barron, Lipez, and Hawkins*,
Circuit Judges.

---

Peter Goldberger, with whom Pamela A. Wilk was on brief, for appellant.

Julia M. Meconiates, Assistant United States Attorney, with whom Rosa Emilia Rodríguez-Vélez, United States Attorney, Nelson Pérez-Sosa, Assistant United States Attorney, Chief, Appellate Division, and Francisco A. Besosa-Martínez, Assistant United States Attorney, were on brief, for appellee.

---

October 31, 2016

---

* Of the Ninth Circuit, sitting by designation.

**LIPEZ**, **Circuit Judge**.   In this appeal from a denial of a coram nobis petition, defendant-appellant Vincent F. Castro-Taveras ("Castro") argues that his guilty plea entered more than a decade ago should be vacated because of Fifth and Sixth Amendment violations.   Castro asserts that (i) his counsel provided ineffective assistance in erroneously advising him that a guilty plea would not result in any deportation consequences, and (ii) the prosecutor in the case induced him to enter the plea, thereby rendering it involuntary, by making a similar misrepresentation regarding the lack of deportation consequences.   Castro also claims that, even if we deny the writ, he is entitled to a remand for an evidentiary hearing for further fact-finding.

After careful consideration, we conclude that, while his Fifth Amendment claim against the prosecutor lacks merit, Castro's Sixth Amendment claim is not -- contrary to the conclusion of the district court -- barred by the retroactivity doctrine.   We, therefore, vacate and remand the case.   On remand, the district court should conduct an evidentiary hearing to determine if Castro's ineffective assistance of counsel claim has merit.

**I.**

Castro has been a permanent resident of the United States since November 20, 1995.   On July 9, 2002, a grand jury in Puerto Rico returned a twenty-eight-count indictment charging Castro and seventeen co-defendants with offenses arising out of an insurance

fraud. Castro was charged in fourteen of those counts, all of which related to insurance and mail fraud.

With the aid of his attorney, Castro began negotiating with the government for a plea and cooperation agreement ("plea agreement"). The plea agreement stated that Castro would plead guilty to four counts charging conspiracy to commit, and aiding and abetting, insurance and mail fraud. It also contained a standard disclaimer stating that "[t]he United States has made no promises or representations except as set forth in writing in this [plea agreement] and den[ies] the existence of any other term[s] and conditions not stated herein." The agreement contained no information about the deportation consequences of the plea. Castro entered the plea on December 20, 2002. He subsequently cooperated with the government and testified at his co-defendant's trial.

Following Castro's conviction, the probation officer assigned to his case filed a Pre-sentence Investigation Report ("PSR"), which stated, among other things, that Castro "will face deportation proceedings" as a result of his conviction because of "the nature of the . . . offense" to which he pleaded guilty. Castro's counsel objected to the reference to deportation because "it is not sure if Mr. Castro will be imprisoned as a result of the sentence to be imposed." The probation officer responded in an Addendum to the PSR:

> The Court should be aware that whether or not defendant is sentenced to imprisonment term or probation, the defendant will face deportation proceedings. According to the Immigration and Nationality Act, . . . section 101(a)(43)(M)(i) defines defendant's conviction as an aggravated felony since it is an offense that involves fraud or deceit in which the loss to the victim or victims exceeds $10,000. Furthermore, section 237(a)(2)(A)(iii) of the Act states that at any time after admission or conviction of an aggravated felony . . ., any alien is deportable. Therefore, defendant's sentence does not change his deportable status with the Bureau of Immigration and Customs Enforcement Agency . . . . Based on the abovementioned information, it is the understanding of the Probation Officer, that the defendant will face deportation procedures whether or not he is sentenced to imprisonment term or to probation.[1]

On April 30, 2002, the district court sentenced Castro to three years' probation. His probation was terminated early, in August 2004.

In June 2011, Castro consulted an immigration attorney to apply for naturalization. The immigration attorney informed him that his guilty plea in 2002 barred him from becoming a U.S. citizen, and that he was subject to mandatory removal based on his

---

[1] Under federal law, the crimes to which Castro pleaded guilty are deemed aggravated felonies because the plea agreement specified the amount of loss resulting from his fraudulent conduct as exceeding $10,000. See 8 U.S.C. § 1101(a)(43)(M)-(M)(i) (defining the term "aggravated felony" to include "an offense that . . . involves fraud or deceit in which the loss to the victim or victims exceeds $10,000").

conviction.[2]  Castro then brought a petition for a writ of coram nobis.  He argued that his plea should be vacated because his attorney provided ineffective assistance in erroneously advising him that a probation sentence from his guilty plea would not affect his immigration status.[3]  In response to the district court's order to show cause, Castro also alleged that the Assistant United States Attorney ("AUSA") in the case provided a similar assurance during the plea negotiations that he would not face a risk of deportation as a result of his plea.  In support, he averred in an affidavit:

> I recall that on several occasions during the meetings with [the AUSA], he told me that I was not going to have problems with immigration, and that they were not going to intervene with me; that is how I interpreted it.

The district court denied Castro's petition.  The court found that Castro's Sixth Amendment claim is barred because its success necessarily depends on the retroactive application of

---

[2] Under 8 U.S.C. § 1227(a), (a)(2)(A)(iii), "[a]ny alien who is convicted of an aggravated felony" "shall, upon the order of the Attorney General, be removed."

[3] The same counsel who allegedly provided ineffective assistance during Castro's plea negotiations also represented Castro in the coram nobis proceedings below.  That counsel wrote in the motion requesting the writ that he "certifies that to the best of his recollection, . . . the advice given to Mr. Castro was that a sentence of probation would not result in deportation and that no reference was made to or discussed about the term aggravated felon on account of the amount of the fraud included in the version of facts appended to the plea and cooperation agreement."

Padilla v. Kentucky, 559 U.S. 356, 364-74 (2010), and Padilla does not apply retroactively to Castro's claim in light of Chaidez v. United States, 133 S. Ct. 1103, 1110-12 (2013). In Padilla, the Supreme Court held that an attorney's incorrect advice or failure to advise on the deportation consequences of a criminal conviction provides a basis for an ineffective assistance of counsel claim. See 559 U.S. at 364-71. In so holding, the Padilla Court overturned the prevalent rule in the circuits, including ours, that deportation consequences do not implicate the Sixth Amendment right to counsel -- at least when the claim is one of a failure to advise -- because they are only collateral consequences of a criminal proceeding. See id. at 364-66, 365 n.9 (citing circuit cases, including United States v. Gonzalez, 202 F.3d 20 (1st Cir. 2000), that categorized the risk of deportation as a collateral consequence precluded from the Sixth Amendment's protection). A few years later, the Supreme Court decided in Chaidez that Padilla announced a new rule at least as to failure-to-advise claims concerning immigration matters.

The district court also dismissed Castro's claim against the prosecutor, which the court understood as inextricably linked to his Sixth Amendment claim, consistent with Castro's presentation of the argument. The court found that Castro's claim concerning the prosecutor's misrepresentation lacks merit because the AUSA is "not the defendant's counsel," and Castro failed to

show "how the purported remarks by the AUSA interfered with his lawyer's ability to make independent decisions about his defense." Additionally, the court denied his request for an evidentiary hearing because it would be futile.  This appeal followed.

## II.

In reviewing a district court's decision on a coram nobis petition, "we afford de novo review to [the court's] legal conclusions and clear-error review to its findings of fact." United States v. George, 676 F.3d 249, 256 (1st Cir. 2012).  Where, as here, the district court denies the writ as a matter of law without an evidentiary hearing, our review is plenary.  Id.

A writ of coram nobis is "a remedy of last resort for the correction of fundamental errors of fact or law."  Id. at 253. To show that the writ is warranted, "a coram nobis petitioner must explain his failure to seek earlier relief from the judgment, show that he continues to suffer significant collateral consequences from the judgment, and demonstrate that the judgment resulted from an error of the most fundamental character."  Id. at 254. Additionally, even when the three requirements are satisfied, the court retains discretion to deny the writ if the petitioner fails to show that "justice demands the extraordinary balm of coram nobis relief."  Id. at 255.  The primary point of dispute in this case is the third requirement of the tripartite test.  Castro claims that the alleged violations of his Fifth and Sixth Amendment rights

constitute fundamental errors, while the government challenges the existence of any error.

Specifically, Castro argues on appeal that his Sixth Amendment claim is not governed by Padilla because Padilla announced a new rule only as to an attorney's failure to advise on the deportation consequences of a conviction, whereas his claim is based on counsel's affirmative misrepresentation regarding such matters. Similarly, Castro contends that the district court "misinterpreted" his argument against the AUSA as a Sixth Amendment claim, when the court should have understood it as a direct Fifth Amendment argument separate and apart from his ineffective assistance claim. The government counters that Castro's claims cannot succeed in any event -- regardless of the validity of the district court's analysis -- because the evidence suggests that he knew of the deportation consequences of his conviction prior to entering the plea. To support this contention, the government introduced for the first time on appeal the transcript of a co-defendant's trial at which Castro testified as a government witness.

We decline to consider the transcript in assessing the merits of Castro's constitutional claims. As a general matter, we "do not consider evidence that was not part of the district court record." United States v. Farrell, 672 F.3d 27, 31 (1st Cir. 2012); Eagle-Picher Indus., Inc. v. Liberty Mut. Ins. Co., 682

F.2d 12, 22 n.8 (1st Cir. 1982) (noting that courts of appeals "may not ordinarily consider factual material not presented to the court below").[4]  Moreover, even if we were to take judicial notice of the transcript, as the government urges us to do, we would not rely on testimony from a different prosecution, untested in this case by the adversarial process, to dispose of Castro's Sixth Amendment claim.[5]  Hence, we deem it prudent to remand the case

---

[4] The government cites Dobbs v. Zant, 506 U.S. 357, 358-59 (1993) (per curiam), in support of its argument that we should consider the transcript and affirm, on that ground, the district court's denial of Castro's coram nobis petition.  Dobbs, however, is distinguishable.  In Dobbs, the district court had rejected a habeas petitioner's ineffective assistance of counsel claim based on the counsel's own testimony about his performance during the closing argument, and the court of appeals affirmed on the same ground.  Id. at 358.  When the petitioner discovered the previously unavailable sentencing transcript following these decisions and presented it in a subsequent appeal, the court of appeals refused to consider it.  Id.  The Supreme Court found that such refusal to consider the transcript -- while summarily affirming the denial of the habeas petition -- was error because the transcript would have "flatly contradicted the account given by counsel in key respects," and the delay in discovery "resulted substantially from the State's own erroneous assertions that closing arguments had not been transcribed."  Id. at 358-59.  By contrast, the government, which had previously conceded the unavailability of the transcript, is asking us to consider the transcript that it discovered in its file cabinet allegedly to the detriment of Castro, and to do so in order to affirm the district court's denial of Castro's coram nobis petition.  Additionally, we have here not only Castro's own account in support of his Sixth Amendment argument, but also his counsel's admission that he erroneously advised Castro as to the deportation risk.  Hence, the equities of the case are reversed from those in Dobbs -- in favor of not relying on the transcript, for the first time, to affirm the denial of Castro's petition and thereby giving Castro a chance to dispute its contents in the district court.

[5] We also note that the cited testimony is not so explicit that it alone could conclusively establish that Castro knew of the removal risk of his conviction at the time he entered the plea.

for an evidentiary hearing to determine whether Castro can establish ineffective assistance of counsel, on the basis of all relevant evidence.

## A. Ineffective Assistance of Counsel Claim

### 1. Retroactivity

The retroactivity of a criminal procedure decision by the Supreme Court turns on whether that decision constituted a new rule at the time a defendant's conviction became final. See Teague v. Lane, 489 U.S. 288, 301, 305-10 (1989). Simply put, barring two exceptions not relevant here,[6] a criminal defendant may not benefit from a new rule in a collateral challenge to his conviction. Id. at 310. A decision announces a new rule "when it breaks new ground or imposes a new obligation" on the government. Id. at 301.

The Teague analysis sets a high bar for retroactivity. A Supreme Court holding will be deemed a new rule -- and, hence, will not apply retroactively to a defendant's collateral challenge

---

Rather, even if the transcript were considered, the district court would need to hold an evidentiary hearing to resolve the factual question of Castro's knowledge.

[6] The two exceptions to the retroactivity rule are when the new rule "places certain kinds of primary, private individual conduct beyond the power of the criminal law-making authority to proscribe," and when the new rule "requires the observance of those procedures that . . . are implicit in the concept of ordered liberty." Teague, 489 U.S. at 307 (internal quotation marks omitted) (ellipses in Teague). Under such circumstances, the new rule applies retroactively to a collateral challenge.

- 10 -

-- unless the outcome required by that holding would have been "dictated by precedent existing at the time the defendant's conviction became final." Teague, 489 U.S. at 301. An outcome is "dictated" only if "it would have been 'apparent to all reasonable jurists.'" Chaidez, 113 S. Ct. at 1107 (quoting Lambrix v. Singletary, 520 U.S. 518, 527-28 (1997)).

At times, the nature of the legal principle at issue before the Supreme Court will mean that a "new" Supreme Court holding will not give rise to a "new rule" subject to the retroactivity bar. In particular, a case that merely applies a pre-existing principle to different facts does not create a new rule. See Teague, 489 U.S. at 307; Chaidez, 133 S. Ct. at 1107. Indeed, "'[w]here the beginning point' of [the Court's] analysis is a rule of 'general application, a rule designed for the specific purpose of evaluating a myriad of factual contexts, it will be the infrequent case that yields a result so novel that it forges a new rule, one not dictated by precedent.'" Chaidez, 133 S. Ct. at 1107 (quoting Wright v. West, 505 U.S. 277, 309 (1992) (Kennedy, J., concurring in the judgment)) (first alteration in Chaidez). To put it differently, when a holding "appl[ies] a general standard to the kind of factual circumstances it was meant to address," that holding "will rarely state a new rule for Teague purposes." Id. (emphasis added).

- 11 -

Even when a Supreme Court holding constitutes a new rule, however, a defendant may still be able to take advantage of the legal principle it articulates in a collateral proceeding. That would be so if the applicable circuit law, at the time the defendant's conviction became final, was consistent with the Supreme Court's subsequently pronounced rule -- i.e., if circuit precedent anticipated the path the Supreme Court would take, even though that law "would [not] have been 'apparent to all reasonable jurists.'" Chaidez, 113 S. Ct. at 1107 (quoting Lambrix, 520 U.S. at 527-28; see, e.g., United States v. Kovacs, 744 F.3d 44, 50-51 (2d Cir. 2014) (identifying the circuit precedents that preceded Padilla).

In general, then, a defendant in collateral proceedings may benefit from a favorable Supreme Court holding only if he would have been entitled to the same outcome at the time his conviction became final -- either because the holding is not a new rule under Teague or because the holding, even if a new rule, nonetheless reflects the law that would have governed his own case.

Castro concedes that his conviction became final in May 2003, long before the Supreme Court issued its decision in Padilla. Thus, we must first examine the decision in Padilla to determine what portion of its holding constituted a new rule. Specifically, we must determine whether the new rule the Court articulated for ineffective assistance of counsel claims included misadvice on

- 12 -

deportation consequences, as well as the failure to advise. The scope of the new rule guides our review of the lower-court precedent prior to 2003 to determine whether Castro may proceed with his Sixth Amendment claim.[7]

### 2. **Padilla's New Rule**

Padilla held that an attorney's failure to advise regarding deportation consequences of a guilty plea, or the rendering of misadvice about those consequences, may constitute deficient performance under the Strickland standards. 559 U.S. at 373-74; see also Strickland v. Washington, 466 U.S. 668, 687-88 (1984) (articulating the two-pronged inquiry for ineffective assistance of counsel claims). As Chaidez later clarified, however, Padilla also made a threshold determination that an attorney's misadvice or non-advice regarding such matters is within the ambit of the Sixth Amendment's guarantee of effective counsel, even though deportation matters are collateral, not

---

[7] Padilla's new rule plainly governs failure-to-advise claims, see infra, leaving three possibilities for Padilla's impact on misadvice claims. First, the new rule may encompass such claims, meaning that Castro may avail himself of the misadvice holding under Teague only if there was First Circuit precedent prior to 2003 that would have dictated the same outcome as Padilla would in this case. See Chaidez, 133 S. Ct. at 1110-12. Second, the misadvice portion of Padilla's holding may reflect established law, and thus not be part of the new rule -- in which case Castro may rely on that holding (at least assuming there was no contrary First Circuit precedent as of 2003). Third, as explained below, neither of these alternatives may be clearly discernible from Padilla and Chaidez, requiring us to examine our own and other courts' cases to determine the state of the law as of 2003.

direct, consequences of the criminal proceeding. 133 S. Ct. at 1108; see Padilla, 559 U.S. at 366 (holding that "advice regarding deportation is not categorically removed from the ambit of the Sixth Amendment right to counsel"). Indeed, Padilla determined that deportation consequences are "ill suited" to the then-prevalent collateral-direct framework because deportation is "an integral part . . . of the penalty that may be imposed" on aliens who plead guilty to specified crimes. 559 U.S. at 366, 364. This threshold determination, as Chaidez later held, is what gave rise to a new rule in Padilla, and hence is key to understanding what, among Padilla's holdings, Chaidez held constituted a new rule under Teague. See 133 S. Ct. at 1108-09.

At the outset, it is an uncontroversial statement of the law to say that Padilla announced a new rule, at a minimum, as to non-advice claims. In Chaidez, petitioner -- who alleged that her attorney failed to advise her of the deportation consequences of her conviction -- argued that Padilla did not announce a new rule, even as applied to her claim, because Padilla merely extended Strickland -- a rule of general applicability -- to the new factual context of deportation consequences. 133 S. Ct. at 1111. The Chaidez Court rejected this argument. Distinguishing between the questions of "how the Strickland test applied ('Did this attorney act unreasonably?')" and "whether the Strickland test applied ('Should we even evaluate if this attorney acted unreasonably?'),"

- 14 -

id. at 1108, the Court noted that Padilla answered the latter before addressing the former, or, more precisely, it had to do so in light of the then-prevalent collateral-direct distinction. Id. at 1108-09. Indeed, as the Chaidez Court saw it, the Supreme Court's earlier decision in Hill v. Lockhart, 474 U.S. 52 (1985), "left open whether advice concerning a collateral consequence must satisfy Sixth Amendment requirements,"[8] 133 S. Ct. at 1108, and the lower courts, in filling that vacuum, "almost unanimously concluded that the Sixth Amendment does not require attorneys to inform their clients of a conviction's collateral consequences," id. at 1109 (emphasis added). In the face of this near-unanimous rule, Padilla's answer to the "preliminary question about Strickland's ambit" -- "Yes, Strickland governs here" -- "required a new rule" that "altered the law of most jurisdictions." Id. at 1108, 1110.

---

[8] In Hill, a habeas petitioner alleged, inter alia, that his guilty plea was involuntary because his counsel had misinformed him as to his parole eligibility. 474 U.S. at 54. In denying the petition, the district court noted that, even if petitioner's misadvice claim has merit, parole eligibility "is not such a [direct] consequence of [petitioner's] guilty plea that such misinformation renders his plea involuntary," id. at 55 (quoting the district court's opinion), and the court of appeals affirmed. The Supreme Court found it "unnecessary," however, to decide "whether there may be circumstances under which erroneous advice by counsel as to parole eligibility may be deemed constitutionally ineffective assistance of counsel" because, in that case, the Court "conclude[d] that petitioner's allegations [were] insufficient to satisfy the [Strickland] requirement of 'prejudice.'" Id. at 60.

- 15 -

Chaidez's reasoning as articulated above makes clear that the new rule in Padilla arose from the analytical step of removing deportation consequences from the collateral-direct framework, and -- given "the law of most jurisdictions" it altered with respect to failure-to-advise claims -- the new rule necessarily included failure-to-advise claims within its scope. Id. at 1110. What is less clear, however, is whether the new rule -- so premised on the necessity of rendering deportation consequences immune to the strict collateral bar -- extends to affirmative misrepresentation claims. There is no question, for instance, that Padilla's holding encompasses both misadvice and non-advice claims. See 559 U.S. at 370 (noting that the Court's recognition of the uniqueness of deportation consequences does not distinguish "between an act of commission and an act of omission"). Additionally, there is language in Chaidez that seems to favor interpreting the new rule broadly. According to Chaidez, Padilla's answer to the threshold question "breach[ed] the previously chink-free wall between direct and collateral consequences," 133 S. Ct. at 1110, a statement which suggests that the Chaidez Court understood the collateral-direct distinction to be a blanket rule that includes both misrepresentation and failure-to-advise claims. Relatedly, the Chaidez Court wrote that "it was Padilla that first rejected that categorical approach -- and so made Strickland operative -- when a criminal lawyer gives (or fails to give) advice

about immigration consequences." Id. (emphasis added); see also id. (noting that Padilla held that, "however apt [the collateral-direct distinction] may be in other contexts, it should not exempt from Sixth Amendment scrutiny a lawyer's advice (or non-advice) about a plea's deportation risk" (emphasis added)). Indeed, at least one circuit has interpreted Chaidez's reading of Padilla's new rule to include misadvice claims, as well as non-advice claims. See Chavarria v. United States, 739 F.3d 360, 364 (7th Cir. 2014) (holding that pre-Padilla "precedent did not dictate that preclusion of an ineffective assistance claim was unreasonable when it arose from an attorney's material misrepresentation of a deportation risk"); see also United States v. Chan, 792 F.3d 1151, 1161-63 (9th Cir. 2015) (Ikuta, J., dissenting) (arguing that Padilla announced a new rule as to both misadvice and non-advice claims).

We think, however, that a more plausible interpretation of Padilla and Chaidez is that, while the Supreme Court certainly decided that Padilla's new rule covers failure-to-advise claims, the Court did not affirmatively speak on whether Padilla's holding regarding misadvice also constituted a new rule. See, e.g., Chan, 792 F.3d at 1156 ("[T]he language of both Chaidez and Padilla indicates that a [lower] court would not be creating a new rule by holding only that defense counsel's affirmative misrepresentations regarding immigration consequences could constitute an

- 17 -

[ineffective assistance of counsel] claim."). First, the context of the Padilla decision suggests that the Court forged a new rule specifically to extend the Sixth Amendment's protection to non-advice claims. In his post-conviction proceeding, petitioner Padilla claimed that his counsel "not only failed to advise him of [the deportation] consequence prior to his entering the plea, but also told him that he 'did not have to worry about immigration status since he had been in the country so long.'" 559 U.S. at 359 (quoting the lower court opinion). In denying his habeas petition, the Kentucky Supreme Court applied the collateral bar to both claims. See 559 U.S. at 359-60 (describing the state supreme court's view that "neither counsel's failure to advise petitioner about the possibility of removal, nor counsel's incorrect advice, could provide a basis for relief" because "erroneous advice about deportation . . . is merely a 'collateral' consequence of his conviction"). Issues of both misadvice and non-advice, therefore, were before the Supreme Court. See Br. of Petitioner at i, Padilla v. Kentucky, 559 U.S. 356 (2010), 2009 WL 1497552, at *i ("QUESTIONS PRESENTED . . . 2. If a criminal defense attorney falsely advises a non-citizen client that his plea of guilty will not result in deportation, can that misadvice constitute ineffective assistance of counsel under the Sixth Amendment?").

When framing the analysis, however, the Padilla Court narrowed its focus, stating, "[w]e granted certiorari . . . to

decide whether, as a matter of federal law, Padilla's counsel had an obligation to advise him that the offense to which he was pleading guilty would result in his removal from this country." Id. at 360. Consistently, after finding that the risk of deportation is "ill suited" to the collateral-direct distinction, id. at 366, the Padilla Court examined whether a failure to advise a client regarding that risk can rise to the level of deficient performance under the first prong of the Strickland inquiry, without any reference to affirmative misrepresentations, id. at 366-69. Hence, the Court concluded, in that analysis, only that "the weight of prevailing professional norms supports the view that counsel must advise her client regarding the risk of deportation." Id. at 367 (emphasis added).

There is a dichotomy, then, between the scope of the claims that were before the Padilla Court -- which included both misadvice and non-advice claims -- and the depth of the analysis that the Court devoted to each claim -- i.e., providing extensive reasoning for why a failure to advise could constitute deficient performance under Strickland, while providing no comparable reasoning for how misadvice could constitute such performance, once the risk of deportation is removed from the collateral-direct framework. We infer from this dichotomy a distinction between Padilla's holding and Padilla's new rule for Teague purposes. Given that both misadvice and non-advice claims were at issue and

that the Kentucky Supreme Court had applied the collateral bar to both, Padilla's holding had to address both claims, even if the Court decided that non-advice claims are not subject to Strickland. The Court, however, did decide to include non-advice claims in the scope of the Sixth Amendment's ambit, rather than simply including misadvice claims, as the Solicitor General had urged the Court to do. See id. at 369-70. Then, the Court provided extensive justification for why a failure to advise violated the Sixth Amendment. Hence, we think it a reasonable inference that the Padilla Court discussed the non-advice part of the holding at length because the Court believed it to be "break[ing] new ground," Teague, 489 U.S. at 301, as to failure-to-advise claims.

Indeed, it is in this context that the Court's statement -- "there is no relevant difference 'between an act of commission and an act of omission'" for Strickland purposes, Padilla, 559 U.S. at 370 -- should be understood. More than anything, this statement served as an explanation for the Court's decision to reach a failure-to-advise claim as part of its holding -- an explanation that, again, was necessary in light of what the Padilla Court acknowledged was a pervasive rule barring such claims under the Sixth Amendment. See id. at 365 & n.9 (noting that the Kentucky Supreme Court is "far from alone" in holding that the "failure of counsel to advise the defendant of possible deportation consequences is not cognizable as a claim for ineffective

- 20 -

assistance of counsel").  That statement about the scope of its holding does not speak to what the Padilla Court construed as the scope of a new rule.[9]

We do not go so far as to say, however, that Padilla and Chaidez have to be read as affirmatively excluding misrepresentation claims from the scope of the new rule.  There is simply no analysis in Padilla that speaks to the state of the law in the lower courts concerning whether misrepresentation claims are within the Sixth Amendment's protection.[10]  See id. at 364-74.

---

[9] The final paragraph of the Chaidez opinion is to similar effect.  After stating that "[t]his Court announced a new rule in Padilla," the majority goes on to say that, "[u]nder Teague, defendants whose convictions became final prior to Padilla therefore cannot benefit from its holding."  133 S. Ct. at 1113 (emphasis added).  While this summary statement refers to the Court's "holding," it does not say that the entire holding constitutes the new rule that Padilla announced.

[10] We acknowledge that Justice Alito's concurrence in Padilla, joined by the Chief Justice, provides support for reading Padilla's new rule to exclude misadvice on deportation.  See 559 U.S. at 383-87.  Arguing that the Court should have held only that "mislead[ing] a noncitizen client regarding the removal consequences" violates Strickland, Justice Alito wrote that the Padilla Court's non-advice holding "mark[ed] a major upheaval" because it did not have support in the existing Sixth Amendment law.  Id. at 383.  As he explained, the Padilla majority did not cite "a single case, from [the Supreme Court] or any other federal court, holding that criminal defense counsel's failure to provide advice concerning the removal consequences of a criminal conviction violates a defendant's Sixth Amendment right to counsel."  Id.  By contrast, he noted, "the conclusion that affirmative misadvice regarding the removal consequences of a conviction can give rise to ineffective assistance would . . . not [have] require[d] any upheaval in the law" because federal courts of appeals held prior to Padilla that misadvice about collateral matters could violate the Sixth Amendment.  Id. at 386-87.

- 21 -

Indeed, other than the Kentucky Supreme Court's decision, the Padilla Court did not cite any case that applied the collateral bar to misadvice claims. See id. at 365 n.9 (citing only failure-to-advise cases of the lower courts). Moreover, as we previously noted, Chaidez contains language suggesting that both misadvice and non-advice claims are part of the new rule, see, e.g., 133 S. Ct. at 1110 ("It was Padilla that first rejected th[e] categorical approach -- and so made the Strickland test operative -- when a criminal lawyer gives (or fails to give) advice about immigration consequences."). Most importantly, perhaps, when addressing the three federal circuit decisions that had a separate rule for misrepresentation claims prior to Padilla (i.e., subjecting them to Strickland, even while excluding non-advice claims), the Chaidez Court described such a rule as a "minority" view held by "three federal circuits (and a handful of state courts)," id. at 1112 -- rather than a well-established principle of law that would have definitively rendered Padilla's holding on misadvice a mere application of Strickland to a different factual context. See, e.g., id. at 1107 (noting that, when a holding "appl[ies] a general standard to the kind of factual circumstances

---

We are reluctant to rely on this analysis in interpreting Padilla (and Chaidez), however, because the majority opinion in Padilla did not address the lower court decisions on misadvice claims. See id. at 369-74. Moreover, as we note above, there is language in Chaidez that favors construing Padilla's new rule more broadly.

- 22 -

it was meant to address," that holding will "rarely state a new rule for Teague purposes").

Still, such language in Chaidez does not show that Padilla's new rule has to include affirmative misrepresentations on immigration matters. Misadvice was not at issue in Chaidez and hence the Court had no occasion to address it. See 133 S. Ct. at 1106. And the Chaidez Court itself cited only non-advice cases in describing the "almost unanimous[]" rule of the lower courts that was then reversed by Padilla. Id. at 1109-10. Moreover, if read to hold that Padilla's new rule extends to misadvice claims, these statements would seemingly be inconsistent with other language in Chaidez. The Court elsewhere observed that the approach to misrepresentations taken in the three aforementioned federal circuits "co-existed happily" with the prevailing view that the failure to advise on deportation consequences did not implicate the Sixth Amendment. Id. at 1112. In other words, the Court appeared to recognize a different Sixth Amendment status in the lower courts for misadvice claims, viewing their favorable treatment as compatible with "the law of most jurisdictions" deeming non-advice claims outside Strickland's scope. Id. at 1110; see also id. at 1112 (noting that the "separate rule for material misrepresentations" recognized by the three courts "lived in harmony with the exclusion of claims like [Chaidez's] from the Sixth Amendment").

What we are left with, then, is a bifurcated holding of _Padilla_, one of which is, without a doubt, a new rule, and the novelty of the other debatable in light of the _Padilla_ and _Chaidez_ decisions. In particular, different elements of the two Supreme Court cases seem to pull in different directions. The context of _Padilla_ suggests that the _Padilla_ Court forged a new rule specifically to extend the Sixth Amendment's protection to failure-to-advise claims regarding immigration consequences. Certain language in _Chaidez_, however, as well as the absence of any acknowledgment in _Padilla_ that misadvice claims had been subject to _Strickland_ theretofore in the lower courts, precludes us from construing the two decisions as affirmatively excluding misadvice claims from the scope of the new rule.

**3. State of the Law Regarding _Strickland_ and Misrepresentations on Collateral Matters**

Having concluded that _Padilla_ and _Chaidez_ left undecided the question of whether _Padilla_'s new rule excludes (or includes) misrepresentation claims, we must undertake our own analysis as to whether _Padilla_'s holding on misadvice would have constituted a new rule based on the state of the law in the lower courts as of 2003. Indeed, the relevant question, in the language of _Teague_, is whether the lower courts in 2003 would have considered application of _Strickland_ to a misadvice claim regarding deportation consequences "a garden-variety application of the test

- 24 -

in Strickland," Chaidez, 133 S. Ct. at 1107, such that it was "apparent to all reasonable jurists," Lambrix, 520 U.S. at 528, that Strickland applied to Castro's claim.

Our own circuit precedent can be dispositive in this analysis. If Padilla's holding on misadvice constituted a new rule in 2003 based on the state of the law in the lower courts, then Castro's Sixth Amendment claim would be barred under Teague, unless he can show that the First Circuit was an exception -- i.e., we had a case prior to 2003 that would have dictated the same outcome as Padilla would in this case. See, e.g., Kovacs, 744 F.3d at 50-51. If, on the other hand, the state of the law in the lower courts indicates that Padilla's holding on misadvice was not a new rule, then Castro may avail himself of that holding, unless perhaps we -- like the Kentucky Supreme Court in Padilla -- had excluded misadvice claims from the Sixth Amendment's scope prior to 2003. Hence, we begin our analysis with our own case law.

### a. Our Circuit

Neither of these two grounds for resolving the retroactivity issue based only on First Circuit case law applies here. As of 2003, we did not have a Sixth Amendment case holding that an attorney's misrepresentation on the risk of deportation is subject to Strickland, nor did we explicitly exclude such misrepresentations from the Sixth Amendment's scope. As to the first proposition, although we did not have a case directly on

point at the intersection of the Sixth Amendment and deportation consequences, we had cases (as we explain below) which collectively suggested that, if the issue had arisen, we would likely have deemed misadvice on such matters to be subject to Strickland.

Unlike the Padilla Court, moreover, we did not recognize the uniqueness of deportation consequences or otherwise find them unsuited to the collateral-direct framework.  To the contrary, the collateral bar appears to have been very much alive in our circuit with respect to immigration matters before 2003, at least when it concerned a failure-to-advise claim.  See Gonzalez, 202 F.3d at 26, 25 (noting that "our precedents regarding the collateral nature of deportation" made deportation "legally irrelevant, even as to an outright guilty plea" for Strickland purposes (internal quotation marks omitted)); Nunez Cordero v. United States, 533 F.2d 723, 726 (1st Cir. 1976) ("While deportation may have a serious effect on a defendant's life, we are not disposed to treat deportation differently from all the other collateral consequences of conviction of which a defendant may learn." (citation omitted)). It is also the case, however, that we never excluded misrepresentations on immigration matters from the Sixth Amendment's scope based on the collateral bar.

This is not to say, of course, that we lacked relevant case law from before 2003 hinting at the same outcome as Padilla would dictate in this case.  Castro points to three such cases --

Correale v. United States, 479 F.2d 944 (1st Cir. 1973), Cepulonis v. Ponte, 699 F.2d 573 (1st Cir. 1983), and Wellman v. State of Maine, 962 F.2d 70 (1st Cir. 1992).

Correale involved a claim that a guilty plea should be vacated as involuntary under the Fifth Amendment because the prosecutor, during the plea negotiations, had made a misrepresentation on a sentencing matter -- a matter that is directly related, not collateral, to a criminal proceeding. 479 F.2d at 947-48. In holding that a guilty plea may be voided under such circumstances, we observed, in dictum, that, in addition to the prosecutor's "obligations of knowledge and clarity" in ensuring that he does not make false promises to the defendant, "[d]efense counsel too must know or learn about the relevant law and evaluate its application to his or her client." Id. at 949. Indeed, we observed that, where, as in that case, counsel had admitted ignorance of the "most fundamental statutory provision relating to sentencing," such failure of knowledge by counsel may "amount to constitutionally ineffective assistance of counsel." Id. at 949.

Cepulonis is more factually analogous to the case at hand. In that case, the defendant alleged that his counsel provided incorrect advice regarding "the details of parole eligibility," which we noted are "considered collateral[,] rather than direct[,] consequences of a plea." 699 F.2d at 577. While

this misinformation argument was "not couch[ed] . . . in terms of ineffective assistance of counsel," id. at 577 n.7, having been framed instead as a direct involuntary plea claim under the Fifth Amendment, we nonetheless posited that a different rule might apply to a misrepresentation claim than to a failure-to-advise claim, id. at 577. As we put it, although a defendant "need not be informed [of such collateral matters] before pleading guilty," "misinformation may be more vulnerable to constitutional challenge than mere lack of information." Id.

We cited that same principle in Wellman. There, we dealt with a claim that the State of Maine had misinformed the defendant on the calculation of his pretrial detention credit during plea negotiations. See 962 F.2d at 71. We noted that, even though a prosecutor's omission of information on such a collateral matter does not render a guilty plea involuntary, id. at 72-73 (citing United States v. Bouthot, 878 F.2d 1506, 1512 (1st Cir. 1989)), a prosecutor's provision of inaccurate or misleading information to secure a guilty plea "is more vulnerable to a constitutional challenge," id. at 73 (citing Cepulonis, 699 F.2d at 577).

We recognize that these cases, alone, do not establish that our circuit law in 2003 would have made Strickland operative on a misadvice claim concerning deportation consequences. See Butler v. McKellar, 494 U.S. 407, 415 (1990) ("[T]he fact that a court says that its decision is within the 'logical compass' of an

- 28 -

earlier decision, or indeed that it is 'controlled' by a prior decision, is not conclusive for purposes of deciding whether the current decision is a 'new rule' under Teague."); Gonzalez, 202 F.3d at 25-26 (citing, in support of the collateral-direct distinction, United States v. Parrino, 212 F.2d 919, 921, 923 (2d Cir. 1954), in which the Second Circuit applied the collateral bar to a misadvice claim). Indeed, unlike the separate rules for misrepresentations that three circuits set forth prior to Padilla, see Chaidez, 133 S. Ct. at 1112, our own separate rule for misrepresentations -- to the extent that we could discern it from the three cases above -- is not based on a holding and does not state explicitly that misadvice on deportation consequences is within the scope of the Sixth Amendment's protection. Compare United States v. Kwan, 407 F.3d 1005, 1015 (9th Cir. 2005) (holding that "where, as here, counsel has not merely failed to inform, but has effectively misled, his client about the immigration consequences of a conviction, counsel's performance is objectively unreasonable under contemporary standards for attorney competence"); United States v. Couto, 311 F.3d 179, 188 (2d Cir. 2002) (holding that "an affirmative misrepresentation by counsel as to the deportation consequences of a guilty plea is today objectively unreasonable"); Downs-Morgan v. United States, 765 F.2d 1534, 1540-41 (11th Cir. 1985) (holding that, under certain circumstances, "counsel's [potentially erroneous] advice

concerning whether [his client] would be deported . . . in response to a specific question" entitles the client to an evidentiary hearing to determine whether his plea should be vacated).

The absence of an explicit rule, however, need not be fatal to Castro's claim, as it does not, by itself, render Padilla's misadvice holding a new rule in our circuit in 2003. Especially given the three First Circuit cases that suggested -- though did not "dictate[]," Teague, 489 U.S. at 301 -- a separate rule for misrepresentations, an agreement among other courts as to the applicability of Strickland to misadvice claims could indicate that Padilla's misadvice holding was dictated in 2003. That is to say, while no case of our own can support the proposition that "all reasonable jurists," Lambrix, 520 U.S. at 528, would have agreed that an affirmative misrepresentation on deportation consequences is subject to Strickland, pre-2003 law in other lower courts -- combined with our own -- could lead us to conclude that Padilla's misadvice holding was, to borrow the words of our sister circuit, simply "awaiting an instance in which it would be pronounced," Kovacs, 744 F.3d at 50.[11] We conclude so here.

---

[11] In Kovacs, the Second Circuit decided that Couto -- its pre-Padilla precedent holding that misadvice on immigration matters is subject to Strickland, 311 F.3d at 188 -- was not a new rule under Teague because it "did nothing more than apply 'the age-old principle that a lawyer may not affirmatively mislead a client.'" Kovacs, 744 F.3d at 51 (quoting Chaidez, 133 S. Ct. at 1119 (Sotomayor, J., dissenting)).

## b. Other Lower Courts

As of 2003, two federal circuits had held that misadvice on deportation consequences can give rise to an ineffective assistance of counsel claim.[12]  See Couto, 311 F.3d at 188; Downs-Morgan, 765 F.2d at 1540-41; cf. Santos-Sanchez v. United States, 548 F.3d 327, 332-36 (5th Cir. 2008) (analyzing an affirmative misrepresentation claim separately from a failure-to-advise-claim, applying the collateral-direct distinction only as to the non-advice argument, while rejecting the assertion that there was any misrepresentation by counsel).  Several federal district courts also had recognized that principle.  See United States v. Khalaf, 116 F. Supp. 2d 210, 214 (D. Mass. 1999) (recognizing that "counsel's affirmative misrepresentation [regarding deportation consequences] in response to a specific inquiry from the defendant may, under certain circumstances, constitute ineffective assistance of counsel"); United States v. Mora-Gomez, 875 F. Supp. 1208, 1213 (E.D. Va. 1995) ("[C]ounsel's affirmative misrepresentation regarding the deportation consequences of a

---

[12] Similarly, the D.C. Circuit recognized before 2003 that, if a prosecutor misleads a defendant about the risk of deportation, rather than simply fails to inform him, the collateral-direct distinction does not bar the defendant from withdrawing his plea based on involuntariness.  See Briscoe v. United States, 432 F.2d 1351, 1353 (D.C. Cir. 1970) ("Under appropriate circumstances the fact that a defendant has been misled as to consequence of deportability may render his plea subject to attack."); accord United States v. Russell, 686 F.2d 35, 41 (D.C. Cir. 1982).

guilty plea may, but does not automatically, constitute ineffective assistance."); see also Acevedo-Carmona v. Walter, 170 F. Supp. 2d 820, 825-26 (N.D. Ill. 2001) (stating that, where defendant's counsel "gave him allegedly erroneous advice regarding deportation and earned good conduct credits," "[w]e do not necessarily agree . . . that Acevedo's counsel performed reasonably," but finding no prejudice "as is required by the second Strickland prong"). These cases prompted the Solicitor General in Padilla to argue that "[t]he vast majority of the lower courts considering claims of ineffective assistance in the plea context have drawn . . . [a] distinction [] between defense counsel who remain silent and defense counsel who give affirmative misadvice." Br. for the United States as Amicus Curiae Supporting Affirmance, Padilla v. Kentucky, 559 U.S. 356 (2010), 2009 WL 2509223, at *8; see also Mora-Gomez, 875 F. Supp. at 1212 (noting that, "among the courts that have decided the question [of whether misadvice as to immigration matters is subject to Strickland], the clear consensus is that an affirmative misstatement regarding deportation may constitute ineffective assistance").

Additionally, at least six federal circuits recognized before 2003 that misadvice on other collateral matters besides immigration consequences -- e.g., parole eligibility -- is (or may be) subject to Strickland. See Beavers v. Saffle, 216 F.3d 918, 925 (10th Cir. 2000) ("[A]ttorney advice which misrepresents the

date of parole eligibility by several years can be objectively unreasonable."); Meyers v. Gillis, 142 F.3d 664, 666 (3d Cir. 1998) (recognizing that "a defendant may be entitled to habeas relief if counsel provides parole eligibility information that proves to be grossly erroneous"); Sparks v. Sowders, 852 F.2d 882, 885 (6th Cir. 1988) ("[G]ross misadvice concerning parole eligibility can amount to ineffective assistance of counsel."); Hill v. Lockhart, 894 F.2d 1009, 1010 (8th Cir. 1990) (en banc) ("[T]he erroneous parole-eligibility advice given to Mr. Hill was ineffective assistance of counsel under [Strickland]."); Czere v. Butler, 833 F.2d 59, 63 n.6 (5th Cir. 1987) ("Even if the Sixth Amendment does not impose on counsel an affirmative obligation to inform clients of the parole consequences of their pleas, . . . other courts have recognized a distinction between failure to inform and giving misinformation[.]"); Strader v. Garrison, 611 F.2d 61, 65 (4th Cir. 1979) ("[T]hough parole eligibility dates are collateral consequences of the entry of a guilty plea of which a defendant need not be informed if he does not inquire, when he is grossly misinformed about it by his lawyer, and relies upon that misinformation, he is deprived of his constitutional right to counsel.").

Likewise, numerous state courts also recognized before 2003 that an attorney's misrepresentation on a collateral matter may be subject to the Sixth Amendment's protection. See Roberti

v. _State_, 782 So. 2d 919, 920 (Fla. Dist. Ct. App. 2001); _Goodall_ v. _United States_, 759 A.2d 1077, 1082 (D.C. 2000); _State_ v. _Vieira_, 760 A.2d 840, 843-44 (N.J. Super. Ct. 2000); _People_ v. _Ping Cheung_, 186 Misc. 2d 507, 510 (N.Y. Sup. Ct. 2000); _State_ v. _Goforth_, 503 S.E.2d 676, 678 (N.C. Ct. App. 1998); _People_ v. _Garcia_, 815 P.2d 937, 942 (Colo. 1991) (en banc); _Hinson_ v. _State_, 377 S.E.2d 338, 339 (S.C. 1989); _Matter of Peters_, 750 P.2d 643, 646 n.3 (Wash. Ct. App. 1988); _Meier_ v. _State_, 337 N.W.2d 204, 207 (Iowa 1983).

These cases are particularly relevant here because, as the _Chaidez_ Court noted, when a holding "appl[ies] a general standard to the kind of factual circumstances it was meant to address," that holding will "rarely state a new rule for _Teague_ purposes." 133 S. Ct. at 1107; _see_ _also_ _Wright_, 505 U.S. at 309 (Kennedy, J., concurring in the judgment) ("Where the beginning point is a rule of general application, a rule designed for the specific purpose of evaluating a myriad of factual contexts, it will be the infrequent case that yields a result so novel that it forges a new rule, one not dictated by precedent."). Much as we found no cognizable difference between deportation consequences and other collateral matters when the collateral bar worked to insulate a failure to inform from a constitutional challenge, _see_ _Nunez Cordero_, 533 F.2d at 726, we find here no cognizable difference between the risk of deportation and other collateral

matters in recognizing that this judicial consensus demonstrates that we are bound to apply Strickland to misadvice claims.

Further reinforcing this consensus is the absence of any case holding to the contrary. Indeed, with the exception of the Kentucky Supreme Court decision in Padilla, our survey does not reveal any case from federal or state courts holding that misadvice concerning collateral consequences, and on removal in particular, can never be subject to Strickland because of the collateral-direct distinction. See generally Padilla, 559 U.S. at 387 (Alito, J., concurring) ("[I]t appears that no court of appeals holds that affirmative misadvice concerning collateral consequences in general and removal in particular can never give rise to ineffective assistance.").[13]

Hence, the legal landscape in the lower courts as of 2003 indicates that the underlying principle for Padilla's misadvice holding -- that an attorney's misrepresentation, even on a collateral matter, may constitute ineffective assistance -- was so embedded in the fabric of the Sixth Amendment framework that

---

[13] Common sense and fairness also support the distinction between misadvice and failure-to-advise claims. If an attorney takes it upon himself to advise a client about a material matter, thereby suggesting that he knows what he is talking about, but then provides incorrect advice, the client should be able to bring an ineffective assistance of counsel claim regardless of whether the matter was of a collateral nature. The same cannot be said of a situation when an attorney simply fails to advise a client of matters that are collateral to a criminal proceeding.

"all reasonable jurists," Lambrix, 520 U.S. at 528, would have agreed that Strickland applied to misadvice claims on deportation consequences.[14] See generally Dyer v. Calderon, 151 F.3d 970, 984 (9th Cir. 1998) (en banc) (noting that a particular rule is not new under Teague, despite the absence of a Supreme Court decision announcing it, because it is "so deeply embedded in the fabric of due process that everyone takes it for granted"). That is to say,

---

[14] To be sure, counsel's misadvice about the deportation consequences of a plea may implicate Fifth Amendment concerns about the voluntariness of a defendant's guilty plea. See Padilla, 559 U.S. at 391-92 (Scalia, J., dissenting). But, it was clear before 2003 both that the Sixth Amendment "right to the Assistance of Counsel in his defence" applies to pleas, see Hill, 474 U.S. at 58, and that, as our review of the precedent shows, this right provides its own protection against such misadvice. Moreover, the prejudice inquiry under Strickland does not turn on whether the defendant's plea was knowing and voluntary within the meaning of the Fifth Amendment. It turns on whether the defendant can show that there is "a reasonable probability that, but for counsel's errors, [the defendant] would not have pleaded guilty and would have insisted on going to trial." Premo v. Moore, 562 U.S. 115, 129 (2011) (quoting Hill, 474 U.S. at 59). Compare Brady v. United States, 397 U.S. 742, 755 (1970) (noting in the Fifth Amendment context that "[a] plea of guilty entered by one fully aware of the direct consequences, including the actual value of any commitments made to him by the court, prosecutor, or his own counsel, must stand unless induced by threats (or promises to discontinue improper harassment), misrepresentation (including unfulfilled or unfulfillable promises)"), with Couto, 311 F.3d at 188-91 (concluding, without invoking Brady or Fifth Amendment principles, that the defendant could obtain withdrawal of her guilty plea under the Sixth Amendment if she could demonstrate that there was a reasonable probability that, but for her attorney's misadvice as to deportation consequences, she would not have pleaded guilty and would have insisted on going to trial). Thus, the fact that the Fifth Amendment may afford protection against misadvice about the deportation consequences of a plea provides no basis for concluding that the Sixth Amendment does not.

if Castro's misadvice claim had been before us in 2003, we would have been required to apply the general standard of Strickland "to the kind of factual circumstances it was meant to address," Chaidez, 133 S. Ct. at 1107, and addressed his claim on the merits. Hence, Padilla's misadvice holding did not constitute a new rule and does not bar Castro's claim here.[15]

* * *

We add a few final thoughts in concluding our Teague analysis. As we previously noted, Teague sets a high bar for retroactivity. See 489 U.S. at 301. Indeed, the Teague standard requiring that a holding be "dictated" for it to be considered an

---

[15] We are particularly persuaded that we would have been bound to apply Strickland to Castro's claim in 2003 given the nature of the misrepresentation at issue. Indeed, Castro claims that his lawyer made "affirmative representations . . . that his guilty plea would not result in any negative immigration consequences" and presents, in support of this claim, an affidavit in which his counsel stated, "the advice given to Mr. Castro was that a sentence of probation would not result in deportation." Assuming, without deciding, the truth of Castro's allegations, such advice regarding the risk of removal was gross misadvice because it was clearly contrary to law. The governing statute at the time provided that "[a]ny alien who is convicted of an aggravated felony . . . is deportable." 8 U.S.C. § 1227(a)(2)(A)(iii). There was little doubt that Castro had committed an aggravated felony because his plea agreement specified that his fraudulent conduct had resulted in over $10,000 in losses. See 8 U.S.C. § 1101(a)(43)(M)-(M)(i). Hence, we have here a situation where an attorney provided incorrect advice regarding the removal consequence of his client's plea -- a consequence that the Padilla Court described as a "severe penalty," 559 U.S. at 365 -- when the correct answer was clearly set forth in the law. We take no position on whether a less clear misadvice claim would have to be -- in light of our holding here -- cognizable under Strickland.

old rule, id., has been criticized by legal scholars as excessively harsh and impossible to satisfy. See Linda Meyer, "Nothing we say matters": Teague and the New Rules, 61 U. Chi. L. Rev. 423, 424 (1994) (arguing that Teague's "dictated by precedent" test is "virtually impossible to satisfy"); Richard H. Fallon, Jr. & Daniel J. Meltzer, New Law, Non-Retroactivity, and Constitutional Remedies, 104 Harv. L. Rev. 1731, 1748 (1991) (observing that "Teague shields state convictions from collateral attacks based not simply on 'clear breaks' in the law, but . . . even from those relying on 'gradual' developments [in the law over which reasonable jurists may disagree]").

In addition, the Teague analysis is particularly difficult here because the Supreme Court had not, prior to Padilla, addressed the Sixth Amendment's application to the collateral consequences of a guilty plea in other, analogous, contexts. See Hill, 474 U.S. at 60 ("We find it unnecessary to determine whether there may be circumstances under which erroneous advice by counsel as to parole eligibility may be deemed constitutionally ineffective assistance of counsel[.]"); Padilla, 559 U.S. at 365 ("We . . . have never applied a distinction between direct and collateral consequences to define the scope of constitutionally 'reasonable professional assistance' required under Strickland[.]" (quoting Strickland, 366 U.S. at 689)). Hence, we are faced with deciding whether Padilla's misadvice holding was "dictated" by

prior law without the guidance that could be drawn from comparable Supreme Court precedent. Moreover, the number of lower court decisions applying Strickland to a collateral matter is progressively greater the lower the persuasive authority, from federal courts of appeals to district courts to state courts. See supra. Indeed, that distribution of precedent may offer some support to our sister circuit's conclusion that the existing law is insufficient to show that "all reasonable judges, prior to Padilla, thought they were living in a Padilla-like world," Chavarria, 739 F.3d at 363 (quoting Chaidez, 133 S. Ct. at 1112).

We believe, however, that the unity of the voice with which the lower courts spoke -- deciding that Strickland applies to misrepresentations on deportation consequences and other collateral matters -- is more significant for Teague purposes than the absolute number of voices or the level of the court. See, e.g., Butler, 494 U.S. at 415 (construing "the differing positions taken by the judges of the Courts of Appeals" as an indication that a holding in question was "susceptible to debate among reasonable minds"). That is to say, the fact that no federal circuit and seemingly no other lower courts (other than the state supreme court in Padilla) excluded misadvice on any collateral matters from the Sixth Amendment's scope makes it an inescapable deduction that we would have been bound to join the prevailing view, if the precise issue had been presented.

We thus hold that Castro's Sixth Amendment claim is not barred by Teague's retroactivity doctrine. Accordingly, we vacate and remand the case. On remand, the district court should conduct an evidentiary hearing to determine whether Castro can satisfy the first and, if applicable, second prong of the Strickland inquiry. As part of that determination, the court may consider the transcript that the government presented on appeal and any other evidence that the court may deem admissible.

## B. Involuntary Plea Claim Based on the Prosecutor's Alleged Misrepresentation

Castro argues that the alleged misrepresentation by the AUSA regarding the lack of immigration consequences of his conviction provides a separate basis for vacating his plea. In particular, he claims on appeal that the district court "misinterpreted" his argument against the prosecutor in analyzing it under the Sixth Amendment framework, when the court should have applied the Fifth Amendment involuntary plea standards. We conclude that the district court did not commit any error.

In his motions to show cause, Castro alleged that the AUSA incorrectly advised him that he would not face adverse immigration consequences as a result of his plea. Castro relied on such misrepresentation by the prosecutor, however, to argue only that his Sixth Amendment right to counsel was violated, not that such alleged assurance induced him to take the plea. Castro

- 40 -

claimed, for instance, that affirmative misadvice by "both counsel and prosecutor constitute[d] instances of unreasonable attorney performance," and that such misrepresentations were prejudicial "to the extent that his Sixth Amendment right to assistance of counsel was hampered." Second Supplementary Motion In Light Of Chaidez,[16] at 5 (¶¶ 6, 7); see also Supplementary Motion In Light Of Chaidez,[17] at 1 (¶¶ 1, 2) (stating that Castro's coram nobis petition is "based on ineffective assistance of counsel under the Sixth Amendment," including "affirmative misrepresentations made by his defense counsel and the [AUSA]").

Castro's motion for reconsideration confirmed that his claim against the AUSA had been framed as, and remained at that point, a Sixth Amendment argument. Castro argued that his cooperation with the government -- which occurred only after he entered the plea -- "created a lawyer-client type relationship" where "[t]he prosecutor in this particular case was also [his] counsel." Motion For Reconsideration,[18] at 3, 2. Accordingly,

---

[16] The full name of this motion is "Second Supplementary Motion To Show Cause In Support Of Not Dismissing The Motion For The Issuance Of A Writ Of Coram Nobis In Light Of The Supreme Court Decision In [Chaidez]."

[17] The full name of this motion is "Supplementary Motion To Show Cause In Support Of Not Dismissing The Motion For The Issuance Of A Writ Of Coram Nobis In Light Of [Chaidez]."

[18] The full name of this motion is "Motion To Reconsider Opinion And Order Issued On June 27, 2014 At Docket Entry 674 And Memorandum Of Authorities."

Castro argued, "[t]he misadvi[c]e by both his counsel and the prosecutor during the plea negotiations . . . [was] unreasonable attorney performance."  Id. at 4 n.2; see also id. at 4 (arguing that "both counsel misled and misrepresented to [Castro] the effect of his plea, thus making his plea one lacking full and true consent").

Under ordinary circumstances, we would deem Castro's direct Fifth Amendment argument, as presented here, forfeited in light of his failure to properly raise it to the district court. See United States v. Olano, 507 U.S. 725, 733 (1993) (holding that a "failure to make [a] timely assertion of a right" results in forfeiture of the claim); United States v. Morgan, 384 F.3d 1, 7 (1st Cir. 2004) (same).  Here, however, the government did not argue forfeiture and instead addressed the merits of Castro's Fifth Amendment claim by contending that the AUSA did not, in fact, misinform Castro of immigration consequences.  Hence, the government waived its forfeiture argument, and we treat Castro's Fifth Amendment claim as preserved.  See United States v. Reyes-Santiago, 804 F.3d 453, 459-60 (1st Cir. 2015) (noting "the maxim that any issue not raised in a party's opening brief is forfeited"); Sotirion v. United States, 617 F.3d 27, 32 (1st Cir. 2010) (holding that the government waived its procedural default defense in a habeas case by failing to raise it in the district court).

That claim fails on the merits, however. Castro's primary contention regarding an alleged due process violation on appeal is that the district court misinterpreted his claim against the prosecutor as a derivative Sixth Amendment argument. We disagree. The district court understood Castro's claim against the AUSA as alleging a Sixth Amendment violation only because Castro argued it as such.

Moreover, in analyzing Castro's due process claim as argued, the district court did not misapply the relevant Sixth Amendment standards governing his claim. Observing that Castro's affidavit in support of his allegations contained only his "interpretation of the AUSA's alleged comments," the district court ruled that, even if such allegations were true, his claim would still fail because "the AUSA is not the defendant's counsel," and he did not show "how the purported remarks by the AUSA interfered with his lawyer's ability to make independent decisions about his defense." See, e.g., Strickland, 466 U.S. at 686 (noting that a criminal defendant's Sixth Amendment right would be violated if the government "interferes in certain ways with the ability of counsel to make independent decisions about how to conduct the defense"). That is, the district court disregarded Castro's claim because he "failed to argue with proper legal citations and supporting authorities how his right to the assistance of counsel

guaranteed by the Sixth Amendment was impinged by the AUSA's alleged acts."

Thus, we affirm the district court's rejection of Castro's Fifth Amendment claim against the prosecutor.[19]

## III.

For the foregoing reasons, we affirm in part and vacate and remand in part the district court's decision. On remand, the district court is instructed to conduct an evidentiary hearing to determine whether Castro's Sixth Amendment claim satisfies Strickland's two-pronged test. In that hearing, the court may consider the transcript that the government presented on appeal, as well as any evidence that the court deems admissible. Castro's direct Fifth Amendment claim against the AUSA, as argued here, is foreclosed.

So ordered.

---

[19] Because we reject Castro's involuntary plea argument against the prosecutor, we find that his claim that he is entitled to specific performance of the prosecutor's promise is moot.