**EX PARTE Samuel OSVALDO Garcia**

**NUMBER 13-16-00427-CR**

Court of Appeals of Texas,
Corpus Christi-Edinburg.

Delivered and filed July 13, 2017

Discretionary Review Granted
November 1, 2017

Hon. Samuel B. Katz, District Attorney's Office, Hon. Luis V. Saenz, District Attorney, Brownsville, TX, for Appellee.

Hon. Rafael De La Garza, III, Edinburg, TX, for Appellant.

Before Justices Rodriguez, Benavides, and Hinojosa

## OPINION

Opinion by Justice Hinojosa

The State of Texas appeals from an order granting Samuel Osvaldo Garcia a post-conviction writ of habeas corpus. *See* TEX. CODE CRIM. PROC. ANN. art. 44.01(k) (West, Westlaw through Ch. 49 2017 R.S.) (authorizing the State to appeal an order granting habeas relief under article 11.072), art. 11.072 (West, Westlaw through Ch. 49 2017 R.S.). In two issues, the State complains (1) that the habeas court erred in granting relief on the ground that Garcia's counsel was not ineffective; and (2) alternatively, that the trial court erred in not addressing the issue of laches. We affirm.

### I. BACKGROUND

Garcia was born in Guatemala in 1969. When Garcia was approximately ten years old, his family immigrated to the United States. In 1987, Garcia became a lawful permanent resident.

## A. Drug Charge, Deportation, and Illegal Re-Entry

In 2002, Garcia was indicted on a charge of possession, with intent to deliver, of four grams or more but less than 200 grams of cocaine, a first-degree felony. *See* Act of Jun. 15, 2001, 77 Leg., R.S., 2001 Tex. Sess. Law Serv. Ch. 1188 (amended 2009) (current version Tex. Health & Safety Code Ann. § 481.112 (West, Westlaw through Ch. 49 2017 R.S.)). On December 5, 2002, Garcia, represented by counsel, pleaded guilty to the charged offense. The trial court found Garcia guilty and pursuant to a plea agreement, imposed a sentence of ten years' imprisonment, suspended the sentence, placed Garcia on community supervision for a term of ten years, and assessed a $500 fine.

In 2003, the United States government placed Garcia in removal proceedings pursuant to the 2002 guilty plea. An immigration judge ordered Garcia removed from the United States that same year, and Garcia was deported to Guatemala. Garcia remained in Guatemala for approximately two months before illegally entering the United States in 2004. He has remained in the United States ever since. In the meantime, the State moved to revoke Garcia's community supervision.

## B. Subsequent Arrest and Conviction for Illegal Re-Entry

In 2013, a police officer initiated a traffic stop on the pickup truck Garcia was driving because some lights were allegedly malfunctioning. Garcia could not produce a driver's license, but he identified himself. The officer was alerted to an arrest warrant for Garcia, and he was taken into police custody. Thereafter, the state district court granted the State's motion to dismiss the motion to revoke. Garcia was tried in federal court for illegal re-entry, and he was sentenced to fifteen months'

confinement. Upon completing his federal sentence, Garcia was remanded to a state correctional facility. He remains in custody to this date.

## C. Initial Habeas Proceeding

In May 2014, Garcia filed an application for post-conviction writ of habeas corpus, alleging that his trial counsel denied him effective assistance of counsel. Garcia asserted that he "was not, at any time prior to or during the [2002 proceeding] advised that he would lose his Lawful Permanent Resident Status, he would be deported and that he would be inadmissible for re-entry into the U.S. as a direct result of pleading guilty [to the 2002 possession charge]." Garcia further contended, in a supporting affidavit attached to his habeas application, that he recalled asking his trial counsel, prior to pleading guilty, whether his guilty plea would result in his deportation and that trial counsel told him that he "would probably be okay" and that the charge "would probably not result in deportation." The State filed a response that refuted Garcia's allegations and also invoked the doctrine of laches. The habeas court summarily denied Garcia's application. A panel of this Court reversed the habeas court's denial of Garcia's application for post-conviction writ of habeas corpus and remanded the case for further proceedings. *See Ex Parte Garcia*, No. 13-14-00501-CR, 2016 WL 454997 at *4 (Tex. App.—Corpus Christi Feb. 4, 2016, no pet.) (mem. op., not designated for publication).

## D. Subsequent Habeas Proceeding

On remand, Garcia amended his application for habeas corpus. He argued that *Chaidez* left open the possibility of ineffective assistance claims based on affirmative misadvice of former counsel. Garcia attached to his amended application: (1) a "Judgment of Conviction; Sentence Sus-

pended; Placement on Community Supervision" signed by the trial court on January 29, 2003; (2) an affidavit that Garcia signed on May 1, 2014; (3) a "Written Waiver and Consent to Stipulation of Testimony, Waiver of Jury, and Plea of Guilty" signed by Garcia on December 5, 2002; (4) an affidavit signed by Garcia's trial counsel on July 25, 2014; (5) a transcript of a December 5, 2002 hearing; and (6) this Court's opinion in the aforementioned appeal. The State did not respond in writing to Garcia's amended application.

In May 2016, the habeas court held an evidentiary hearing at which four witnesses testified: Garcia; Garcia's trial counsel; Garcia's sister-in-law, Gloria Espinoza; and Garcia's brother, Marvin Garcia.

### 1. Garcia

Garcia testified that he had a "very brief" conversation with his trial counsel regarding his plea and its potential consequences on his immigration status. Garcia reiterated the assertion in his affidavit that his trial counsel "said that I should be okay, be fine" regarding his immigration status.

As for the underlying offense, Garcia explained that he "was at the wrong place, at the wrong time." Garcia did mechanic work "on the side" at a shop near his home. Garcia met a man named "Cruz Rodriguez" through this mechanic work. One day, as Garcia was leaving the shop, Rodriguez put "something" in Garcia's pocket. Garcia assumed the "something" was a monetary tip because Rodriguez was known for such gestures. However, it was cocaine. Garcia was confronted by Drug Enforcement Agency ("DEA") agents immediately upon leaving the shop. A DEA agent found the cocaine on Garcia's person. Garcia denied ownership, but he did not implicate Rodriguez out of fear.

### 2. Garcia's Trial Counsel

In 2003, Garcia's trial counsel was an assistant public defender who was appointed to represent Garcia. Garcia's trial counsel testified that he could not recall how many times he met with Garcia in either a court or an out-of-court setting. Trial counsel could not remember ever meeting with Garcia's family. He also had no independent recollection of any discussion with Garcia about immigration consequences stemming from Garcia's guilty plea. Trial counsel denied advising Garcia that his plea of guilty "would probably not result in deportation." When asked whether he was surprised by Garcia's assertion that such advice was given, trial counsel responded, "Well, it doesn't surprise me. When someone is filing an appeal, they might say whatever they want to say; but, whether I said that or not, I never would have told him that."

### 3. Espinoza

Espinoza attended the 2002 hearing where Garcia pleaded guilty. She served as a translator for Garcia and Garcia's mother, who only spoke Spanish. Espinoza recalled that Garcia's trial counsel was "in a hurry" the day Garcia pleaded guilty. Espinoza specifically recalled Garcia asking trial counsel if he "was going to be okay with his deportation and his green card," and he answered, "Yes."

### 4. Marvin

Marvin testified that he had met Rodriguez a couple of times, and Rodriguez "seemed like he had money." Marvin believed that Garcia pleaded guilty because he was afraid of Rodriguez.

### E. Findings, Conclusions, and Habeas Relief

In June 2016, the habeas court signed findings of fact and conclusions of law. It found, among other things,

4. Former Counsel regularly represented multiple defendants. Former Counsel did not have an independent recollection of Defendant's case. Former Counsel only remembered that it was his custom to recite the statutory admonishments to criminal defendants before a plea.

5. Applicant never met with Former Counsel outside of the Court. Applicant only met with Former Counsel in Court on two occasions, for a short period of time on each occasion.

6. On or about December 2002, Former Counsel advised Defendant that the State was offering probation for ten (10) years. Applicant inquired regarding the immigration consequences of his plea and was advised as follows: *"I asked my attorney if I would be deported if I pled guilty to the charge and got probation. He said that I would probably be okay. He said that the charge would probably not result in deportation."*

7. The Applicant's sister in law was present at the hearing and overheard Former Counsel advise Applicant that he would be "okay" and that "the charge would probably not result in deportation."

8. The Applicant relied on Former Counsel's affirmative misadvise [sic] and entered a plea of guilty to the charge Possession of a Controlled Substance with Intent to Deliver on January 29 2003, in cause number 02CR 1042-E.

. . . .

10. The admonishments from the Court and the plea documents were ineffective [because] the Applicant had been previously misadvised by Former Counsel that he would be "okay" and that the "charge would probably not result in deportation."

. . . .

13. If Applicant had not been affirmatively misadvised, he would not have pled guilty. The Applicant would have requested a jury trial. Thus, but for Former Counsel's affirmative misadvise [sic] that Applicant would be "okay" and that "the charge would probably not result in deportation," the Applicant would have pled not guilty.

The habeas court granted the relief sought by setting aside and vacating the conviction rendered on January 29, 2003 in *State of Texas v. Samuel Oswaldo Garcia*, Cause No. 02-CR-1042-E, in the 357th Judicial District Court, Cameron County, Texas. The State filed no objections to the findings and conclusions. This appeal followed.

## II. INEFFECTIVE ASSISTANCE OF COUNSEL

In the State's first issue, it argues that Garcia is not entitled to habeas relief because the alleged misadvice he received regarding the immigration consequences of a guilty plea may not be used to advance an ineffective assistance of counsel claim. The State contends that the facts surrounding Garcia's ineffective assistance of counsel claim are "strikingly similar" to those of the habeas applicant in *Padilla v. Kentucky*. 559 U.S. 356, 374, 130 S.Ct. 1473, 176 L.Ed.2d 284 (2010). *Padilla* held that the Sixth Amendment requires that an effective criminal defense counsel inform her client whether his plea carries a risk of deportation. *See id.* The U.S. Supreme Court subsequently held that the right recognized in *Padilla* may not be used by a party to collaterally attack a judgment of conviction that became final prior to the issuance of *Padilla. Chaidez v. U.S.*, 568 U.S. 342, 133 S.Ct. 1103, 1113, 185 L.Ed.2d 149 (2013). This is sometimes referred to as "non-retroactivity."

Garcia argues that his claim is not prohibited by *Chaidez* because it only dealt with instances where counsel provided *no advice* concerning immigration consequences. According to ·Garcia, a different rule controls situations such as his: where counsel affirmatively ·provided *misadvice* concerning the immigration consequences of a guilty plea. Garcia contends that ineffective assistance of counsel claims such as his are not barred by the non-retroactivity holding ·in *Chaidez* and that a court may grants habeas relief even if the applicant's conviction became final prior to *Padilla*'s issuance.

The State responds that under *Chaidez* and multiple Texas cases, *Padilla* is not retroactive in any sense, regardless of whether misadvice or no advice was rendered concerning immigration consequences of a plea.

Before delving into the state court and federal circuit authority and how such authority affects the parties' .arguments, a brief. review of three seminal opinions— *Teague*, *Padilla*, and *Chaidez*—will help frame the first issue and the parties' arguments.

**A.** ***Teague v. Lane*, 489 U.S. 288, 109 S.Ct. 1060, 103 L.Ed.2d 334 (1989), articulated the modern test for determining when a U.S. Supreme Court opinion announces a "new rule" of constitutional law that precludes collateral attacks on a final judgment of conviction.**

The *Teague* Court sought to "clarify how the question of retroactivity should be resolved for cases on collateral review." *Id.* at 300, 109 S.Ct. 1060. In doing so, it articulated that,

> In general, however, a case announces a new· rule when it breaks new ground or imposes a new obligation on· the States or the Federal Government. To put it

differently, a case announces a new rule if the result was not *dictated* by precedent existing at the time the defendant's conviction became final.

*Id.* at 302, 109·S.Ct. 1060 (internal citations omitted) (emphasis in original). No party disputes the test articulated by *Teague*: where a case announces a new rule, that rule is not retroactively available to overturn a final conviction on collateral review. Rather, the parties dispute the extent to which the. seminal case of *Padilla v. Kentucky* announces a new rule.

**B.** ***Padilla v. Kentucky;* 559 U.S. ·356, 130 S.Ct. 1473, 176 L.Ed.2d 284 (2010), held that a criminal-defense attorney is ineffective if he fails to provide advice to a client on whether a plea carries a risk of deportation.**

. In·*Padilla*, the habeas applicant was a Honduran native and lawful permanent resident·of the United States who pleaded guilty to transporting a large amount ·of marijuana on the advice of counsel that·he "did not have to worry about immigration status since he had been in the country so long." *Padilla v. Kentucky*, 559 U.S. 356, 359, 130 S.Ct. 1473,· 176 L.Ed.2d 284 (2010). The Supreme Court granted certiorari "to decide whether, as a matter of federal law, [the habeas applicant's] counsel had an obligation to advise him that the offense to which he was pleading guilty would result in his removal from this country." *Padilla*, 559 U.S. at 359, 130 S.Ct. 1473. In its concluding section, the majority wrote,

> . It is our responsibility under the Constitution to ensure that no criminal defendant—whether a citizen or not—is left to the "mercies of incompetent counsel." To satisfy this responsibility, we now hold that counsel must inform her client whether his plea carries a risk of deportation. Our longstanding Sixth Amendment precedents, the seriousness

of deportation as a consequence of a criminal plea, and the concomitant impact of deportation on families living lawfully in this country demand no less.

Taking as true the basis for his motion for postconviction relief, we have little difficulty concluding that [the applicant] has sufficiently alleged that his counsel was constitutionally deficient.

*Id.* at 374, 130 S.Ct. 1473.

In explaining its holding, the Supreme Court addressed a rule developed by lower courts and the federal government's request for a narrower rule. The Court observed that lowers courts had held that collateral consequences are outside the scope of representation required by the Sixth Amendment, and, therefore, the *failure* of defense counsel to advise the defendant of possible deportation consequences is not cognizable as a claim for ineffective assistance of counsel. *Id.* at 365, 130 S.Ct. 1473 (internal citations and quotation marks omitted) (emphasis added). The Court, however, disclaimed recognizing such a distinction. *Id.* ("We, however, have never applied a distinction between direct and collateral consequences to define the scope of constitutionally 'reasonable professional assistance' required under *Strickland*."). The Court concluded that "advice regarding deportation is not categorically removed from the ambit of the Sixth Amendment right to counsel." *Id.* at 366, 130 S.Ct. 1473. In other words, "*Strickland* applie[d] to [the applicant's] claim." *Id.*

The Court also addressed the federal government's request for a rule that *Strickland* apply to the applicant's claim only to the extent that he alleged affirmative misadvice. *Id.* at 369, 130 S.Ct. 1473. The Court wrote that "there is no relevant difference between an act of commission and an act of omission in this context." *Id.* at 370, 130 S.Ct. 1473 (internal citations and quotation marks omitted). It concluded that a "holding *limited* to affirmative

misadvice would invite two absurd results." *Id.* (emphasis added). The way the Court dismissed the federal government's request is telling. The majority viewed the requested rule barring misadvice on immigration consequences under *Strickland* to be "limited" as compared to the rule that the Court ultimately crafted.

A concurring opinion, authored by Justice Alito and joined by Chief Justice Roberts, highlights the distinction between a narrow rule, embracing only affirmative misadvice, and a broad rule, generally requiring more than no advice. *Id.* at 375–388, 130 S.Ct. 1473. Justice Alito begins his opinion by writing, "I concur in the judgment because a criminal defense attorney fails to provide effective assistance within the meaning of *Strickland*, if the attorney misleads a noncitizen client regarding the removal consequences of a conviction." *Id.* at 375, 130 S.Ct. 1473 (internal citation omitted). In advocating for a rule on only affirmative misadvice, Justice Alito argued,

> As the Court appears to acknowledge, thorough understanding of the intricacies of immigration law is not within the range of competence demanded of attorneys in criminal cases. By contrast, reasonably competent attorneys should know that it is not appropriate or responsible to hold themselves out as authorities on a difficult and complicated subject matter with which they are not familiar. Candor concerning the limits of one's professional expertise, in other words, is within the range of duties reasonably expected of defense attorneys in criminal cases.

*Id.* at 385, 130 S.Ct. 1473 (internal citations and quotation marks omitted). Justice Alito further elaborated about how the lower courts had coalesced around a rule regarding affirmative misadvice,

> [T]he conclusion that affirmative misadvice regarding the removal consequences of a conviction can give rise to

ineffective assistance would, unlike the Court's approach, not require any upheaval in the law. As the Solicitor General points out, [t]he vast majority of the lower courts considering claims of ineffective assistance in the plea context have [distinguished] between defense counsel who remain silent and defense counsel who give affirmative misadvice. At least three Courts of Appeals have held that affirmative misadvice on immigration matters can give rise to ineffective assistance of counsel, at least in some circumstances. And several other Circuits have held that affirmative misadvice concerning nonimmigration consequences of a conviction can violate the Sixth Amendment even if those consequences might be deemed collateral. By contrast, it appears that no court of appeals holds that affirmative misadvice concerning collateral consequences in general and removal in particular can *never* give rise to ineffective assistance. In short, the considered and thus far unanimous view of the lower federal courts charged with administering *Strickland* clearly supports the conclusion that Kentucky Supreme Court's position goes too far.

*Id.* at 386–87, 130 S.Ct. 1473 (internal citations and quotation marks omitted) (emphasis in original).

## C. *Chaidez v. U.S.*, 568 U.S. 342, 133 S.Ct. 1103, 185 L.Ed.2d 149 (2013), prohibited applicants from collaterally attacking a final judgment of conviction premised on the "new rule" articulated by *Padilla*.

*Padilla* left open the question of whether it applies retroactively to those seeking to attack a final judgment of conviction in a collateral proceeding. That question was answered in the negative by the *Chaidez* Court.

■ In *Chaidez*, the *coram nobis*[1] applicant was a Mexican citizen and lawful permanent resident of the United States. 133 S.Ct. at 1105. The applicant pleaded guilty to mail fraud, was sentenced to four years' probation, and ordered to pay restitution. *Id.* at 1106. Her conviction became final in 2004. *Id.* In 2009, immigration officials initiated removal proceedings against the applicant, and she sought to overturn the conviction. *Id.* The applicant argued that her former attorney's failure to advise her of the immigration consequences of pleading guilty constituted ineffective assistance of counsel under the Sixth Amendment. *Id.* As the applicant's post-conviction proceeding was advancing through the lower federal courts, *Padilla* was decided. *Id.* The federal government argued that the appellant could not benefit from *Padilla* because it announced a "new rule" and, under *Teague*, such rules do not apply in collateral challenges to already-final convictions. *Id.*

The Court's dissenting justices and the applicant asserted that *Padilla* did not announce a new rule and that it was instead a run-of-the-mill application of *Strickland*. *Id.* at 1111. As support for her proposition, the applicant pointed to three federal appeals courts allowing ineffective assistance of counsel claims when attorneys affirmatively misled their clients about the deportation consequences of

---

1. A petition for a writ of *coram nobis* provides a way to collaterally attack a criminal conviction for a person who is no longer "in custody" and therefore cannot seek habeas relief under 28 U.S.C. § 2255 or § 2241. Chaidez and the Government agreed that nothing in the case turned on the difference between a *coram nobis* petition and a *habeas* petition, and the Court assumed without deciding that the parties were correct. *Chaidez v. U.S.*, 568 U.S. 342, 133 S.Ct. 1103, 1106 n.1, 185 L.Ed.2d 149 (2013).

guilty pleas. *Id.* The Court's majority disagreed. *Id.*

In rejecting the applicant's argument that *Padilla* did not announce a new rule, the Court addressed the distinction that had evolved in the lower courts between direct and collateral consequences. *Id.* The Court noted that its first order of business in *Padilla* was "to consider whether the widely accepted distinction between direct and collateral consequences categorically foreclosed Padilla's claim, *whatever the level of his attorney's performance.*" *Id.* (emphasis added). The Court emphasized that it "did not eschew the direct-collateral divide across the board." *Id.* (internal citations omitted). In addressing the three federal cases, the Court wrote,

> True enough, three federal circuits (and a handful of state courts) held before *Padilla* that misstatements about deportation could support an ineffective assistance claim. But those decisions reasoned only that a lawyer may not affirmatively misrepresent his expertise or otherwise actively mislead his client on any important matter, however related to a criminal prosecution. They coexisted happily with precedent, from the same jurisdictions (and almost all others), holding that deportation is not "so unique as to warrant an exception to the general rule that a defendant need not be advised of the [collateral] consequences of a guilty plea." So at most, [the applicant] has shown that a minority of courts recognized a separate rule for material misrepresentations, regardless whether they concerned deportation or another collateral matter. That limited rule does not apply to [the applicant's] case. And because it lived in har-

mony with the exclusion of claims like hers from the Sixth Amendment, it does not establish what she needs to—that all reasonable judges, prior to *Padilla*, thought they were living in a *Padilla*-like world.

*Id.* at 1112 (internal citations omitted).

**D. The authority referenced by the State does not adequately address the intricacies of *Padilla* and *Chaidez*.**

In support of its first issue, the State refers us to one federal circuit court opinion, *Chavarria v. United States*, 739 F.3d 360 (7th Cir. 2014), and two unpublished state-court memorandum opinions. *See Ex parte Wei Hsi Chien*, No. 01-13-01042-CR, 2014 WL 3697918 (Tex. App.—Houston [1st Dist.] Jul. 24, 2014, no pet.) (mem. op., not designated for publication), *Ex parte Valenzuela–Rodriguez*, No. 03-13-00249-CR, 2014 WL 4363140 (Tex. App.—Austin Aug. 26, 2014, no pet.) (mem. op., not designated for publication).[2]

In *Chavarria*, a defendant pleaded guilty to four counts of distributing cocaine in 2009, a year before *Padilla* was decided. 739 F.3d at 361. The applicant, proceeding *pro se*, collaterally attacked his final judgment of conviction on the ground that his criminal defense counsel misadvised him regarding his deportation inquiries. *Id.* According to the applicant, his "attorney had checked with the Bureau of Immigration and Customs Enforcement . . . and they said they were not interested" in deporting the applicant. *Id.* The federal district court ultimately held that the retroactivity of the applicant's claims was controlled by the retroactivity of *Padilla. Id.* at 361. The U.S. Court of Appeals for the Seventh

---

**2.** Our research has found a third state-court opinion with a holding and rationale similar to *Wei Hsi Chien* and *Valenzuela–Rodriguez*. *See Ex parte Vera*, No. 01-14-00146-CR, 2014

WL 3738089 (Tex. App.—Houston [1 Dist.] Jul. 29, 2014, no pet.) (mem. op., not designated for publication).

Circuit affirmed. *Id.* at 364. Its rationale focused on the fact that prior to *Padilla*, deportation had been regarded by some courts as a "collateral" consequence of a guilty plea, and for which the failure to advise of such consequences could not serve as a basis for a claim of ineffective assistance,

> A lawyer's advice about matters not involving the "direct" consequences of a criminal conviction—collateral matters—is, in fact, irrelevant under the Sixth Amendment; such advice is categorically excluded from analysis as professionally incompetent, as measured by *Strickland*.... Thus, regardless of how egregious the failure of counsel was if it dealt with immigration consequences, pre-*Padilla*, both the Sixth Amendment and the *Strickland* test were irrelevant. The *Chaidez* majority jointly referred to both misadvice and non-advice throughout its opinion. There is no question that the majority understood that *Padilla* announced a new rule for all advice, or lack thereof, with respect to the consequences of a criminal conviction for immigration status.

*Id.* at 362–63 (internal citations omitted). In holding that the applicant's misadvice theory could not be recognized as a pre-*Padilla* rule, the *Chavarria* Court observed that,

> At the time [the applicant's] case became final, precedent did not dictate that preclusion of an ineffective assistance claim was unreasonable when it arose from an attorney's material misrepresentation of a deportation risk. Thus, even if this Court were to find the misadvice/nonadvice distinction relevant to this analysis, it does not have the clear precedential weight to be considered a pre-*Padilla* rule.

*Id.* at 364.

We respectfully conclude that the authority from intermediate appellate courts

referenced by the State fails to appreciate the subtleties at work in *Padilla* and *Chaidez*. In *Wei Hsi Chien*, the court affirmed a denial of habeas relief under *Strickland's* second prong. 2014 WL 3697918 at *2 ("Even if Chien could make a case under pre-*Padilla* law that his counsel's performance was constitutionally deficient, we conclude, based upon our review of the trial court's findings and the record, that Chien failed to prove the second prong of his ineffective assistance claim."). In *Valenzuela–Rodriguez* and *Vera*, the state appellate courts affirmed the denial of habeas relief on a belief that *Padilla* articulated a "new rule" for both no advice and misadvice, and therefore the trial courts did not abuse their discretion in holding that the applicants could not benefit from retroactive application of *Padilla*. *See Valenzuela–Rodriguez*, 2014 WL 4363140 at *3 ("[E]ven if we were to conclude that appellant's trial counsel incorrectly advised appellant as to immigration consequences of the plea agreement, we reject appellant's contention that such advice—as opposed to a counsel's failure to inform a defendant of immigration consequences—dictates a different result under pre-*Padilla* law."); *see also Ex Parte Vera*, No. 01-14-00146-CR, 2014 WL 3738089 (Tex. App.—Houston [1st Dist.] Jul. 29, 2014, no pet.) (mem. op., not designated for publication) (concluding that the nonretroactivity of *Padilla*, as recognized by *Chaidez*, applied to the misadvice context).

The intermediate appellate courts rely on two opinions from the Texas Court of Criminal Appeals. However, neither opinion from the court of criminal appeals directly addresses the viability of misadvice as to immigration consequences. In *Ex Parte De Los Reyes*, the habeas applicant asserted that his defense counsel failed to advise him of the immigration consequence of pleading guilty to a misdemeanor theft charge. 392 S.W.3d 675, 676 (Tex. Crim. App. 2013). The court of criminal appeals

declined to exercise its discretion and permit *Padilla* to have retroactive effect under state habeas law. *Id.* at 679. The opinion in *Ex Parte Oranday-Garcia*, deals with a subsequent application for habeas relief that the convicting court recommended denying. 410 S.W.3d 865, 866 (Tex. Crim. App. 2013). Admittedly, the applicant alleged that his defense counsel was deficient "by advising him that [the] conviction for [the] offense would not result in deportation." *Id.* The court of criminal appeals, without any analysis, summarily equated the applicant's misadvice claim with the non-retroactivity accorded to a no-advice claim. *Id.* at 869.

We conclude that *Oranday-Garcia* does not control our disposition because it, like *De Los Reyes*, did not squarely address the no-advice and misadvice distinction. In other words, the court of criminal appeals has not definitively answered whether affirmative misadvice is barred by the non-retroactivity accorded to a no advice claim.[3] Given the situation, we turn to on-point federal authority for guidance.

**E. A majority of federal circuits have held that an applicant may collaterally attack a final conviction on the ground that his trial counsel was ineffective for misadvising him regarding immigration consequences.**

The most recent circuit court opinion that closely reads *Padilla* and *Chaidez* is

*United States v. Castro-Taveras.* 841 F.3d 34 (1st Cir. 2016). In it, the applicant appealed the denial of *coram nobis* relief, which he sought on the basis that his criminal defense counsel was ineffective for misadvising him on the immigration consequences of pleading guilty to insurance and mail fraud. *Id.* at 36. The federal appellate court recognized that in *Padilla*, the Supreme Court held that an attorney's incorrect advice or failure to advise on the deportation consequences of a criminal conviction provides a basis for an ineffective assistance of counsel claim. *Id.* at 38. It also recognized that *Chaidez* decided that *Padilla* announced a new rule at least as to failure-to-advise claims concerning immigration matters. *Id.*

The *Castro-Taveras* Court reconciled *Teague*, *Padilla*, and *Chaidez* in light of a subtle and confounding distinction in *Padilla*: The applicant in *Padilla* alleged misadvice, according to the Supreme Court's opinion,[4] but the rule announced by the majority was to "failure-to-advise" situations. *Castro-Taveras*, 841 F.3d at 38. In analyzing *Padilla* and *Chaidez*, the *Castro-Taveras* Court observed,

We do not go so far as to say, however, that *Padilla* and *Chaidez* have to be read as affirmatively excluding misrepresentation claims from the scope of the

3. On October 5, 2016, the Texas Court of Criminal Appeals heard oral argument in *Ex Parte Aguilar*, No. WR–82,014–01 (filed and set April 6, 2016; submitted Oct. 5, 2016). The court ordered the application in *Aguilar* filed. The court set *Aguilar* for submission to determine, among other things, "whether the rationale of *Padilla* should be extended to the facts of [Aguilar's] case" and "notwithstanding *Padilla*, whether a defendant's guilty or no contest plea will be rendered involuntary if counsel affirmatively misadvises a defendant about the immigration consequences of his plea." Our finding that Texas law is unsettled regarding whether affirmative misadvice on im-

migration consequences may serve as a basis for an ineffective assistance of counsel claim is further supported by the court of criminal appeals' *Aguilar*.

4. "In this postconviction proceeding, Padilla claims that his counsel not only failed to advise him of this consequence prior to his entering the plea, but also told him that he 'did not have to worry about immigration status since he had been in the country so long.'" *Padilla v. Kentucky*, 559 U.S. 356, 359, 130 S.Ct. 1473, 176 L.Ed.2d 284 (2010).

new rule.... Moreover, as we previously noted, *Chaidez* contains language suggesting that both misadvice and non-advice claims are part of the new rule[.]

....

Certain language in *Chaidez*, however, as well as the absence of any acknowledgment in *Padilla* that misadvice claims had been subject to *Strickland* theretofore in the lower courts, precludes us from construing the two decisions as affirmatively excluding misadvice claims from the scope of the new rule.

*Castro–Taveras*, 841 F.3d at 45–46 (internal citations omitted). In conducting the *Teague* analysis, the court wrote:

[T]he legal landscape in the lower courts as of 2003 indicates that the underlying principle for *Padilla*'s misadvice holding—that an attorney's misrepresentation, even on a collateral matter, may constitute ineffective assistance—was so embedded in the fabric of the Sixth Amendment framework that all reasonable jurists would have agreed that *Strickland* applied to misadvice claims on deportation consequences.

*Castro–Taveras*, 841 F.3d at 51 (internal citations omitted). The court also noted that a reasonable expectation that defense counsel not misadvise a client regarding immigration consequence may implicate Fifth Amendment concerns about the voluntariness of a defendant's guilty plea. *See id.* at 51 n.14.

The *Castro–Taveras* Court ultimately held that *Padilla*'s misadvice holding did not constitute a new rule and did not bar applicant's claim for post-conviction relief. *Id.* at 51. It vacated the district court's summary denial of relief and remanded for an evidentiary hearing. *Id.* at 54. Two other federal circuits have reached the same conclusion. *See U.S. v. Chan*, 792 F.3d 1151 (9th Cir. 2015); *Kovacs v. U.S.*, 744 F.3d 44 (2nd Cir. 2014).

F. **A habeas applicant's claim of ineffective assistance of counsel premised on affirmative misadvice regarding immigration consequences is not barred by the holding in *Chaidez* that *Padilla* articulated a "new rule" and that new rule is non-retroactive.**

[2] The holding in *Chavarria*, 739 F.3d at 364, cannot be reconciled with the holdings in *Castro–Taveras*, 841 F.3d at 51, *Chan*, 792 F.3d at 1158, and *Kovacs*, 744 F.3d at 54. With all due respect to the *Chavarria* Court, its belief that no advice and misadvice are two sides of the same coin fails to appreciate the intricacies in *Padilla*. *Padilla*'s requirement that an effective counsel advise her client as to immigration consequences of a guilty plea is a broad, new rule that encompassed an already existing rule that a defense attorney renders ineffective assistance if she affirmatively misadvises a client as to immigration consequences.

Justice Alito's concurrence in *Padilla* supports a reading that misadvice was an older and narrower rule than no advice. First, he recognized that "reasonably competent attorneys should know that it is not appropriate or responsible to hold themselves out as authorities on a difficult and complicated subject matter with which they are not familiar." *Padilla*, 559 U.S. at 385, 130 S.Ct. 1473 (J. Alito, concurring). Second, Justice Alito observed that at least three federal circuit courts, including the Fifth Circuit,[5] had held that affirmative

---

5. *Padilla v. Kentucky*, 559 U.S. 356, 386 n.3, 130 S.Ct. 1473, 176 L.Ed.2d 284 (2010) (J. Alito, concurring) (citing *Santos–Sanchez v.* *United States*, 548 F.3d 327, 333–34 (5th Cir. 2008)).

misadvice on immigration matters can give rise to ineffective assistance of counsel, at least in some circumstances. *Id.* at 386, 130 S.Ct. 1473; *cf. Rosa v. State*, No. 05-04-00558-CR, 2005 WL 2038175, at *3–4 (Tex. App.—Dallas Aug. 25, 2005, pet. ref'd) (concluding that a plea counsel was ineffective for misadvising a client that a plea of guilty on a charge of "family violence" was not a "deportable" offense when it was in fact and reversing the denial of a motion for new trial as to that offense). Third, he noted that "no [federal] court of appeals holds that affirmative misadvice concerning collateral consequences in general and removal in particular can *never* give rise to ineffective assistance." *Id.* (emphasis in original).

Our reading of *Padilla* and *Chaidez* is further supported by the Supreme Court's recent decision in *Lee v. United States*, ——U.S. ——, 137 S.Ct. 1958, 198 L.Ed.2d 476 (2017). In *Lee*, a habeas applicant attacked a criminal conviction that became final in the federal courts before *Padilla* was decided. *Lee v. United States*, No. 2:09-CR-20011-BBD, 2014 WL 1260388, at *4–5 (W.D. Tenn. Mar. 20, 2014), *aff'd*, 825 F.3d 311 (6th Cir. 2016), *rev'd and remanded*, —— U.S. ——, 137 S.Ct. 1958, 198 L.Ed.2d 476 (2017). A federal magistrate court found that the applicant received ineffective assistance of counsel on the ground that his trial counsel affirmatively misadvised him regarding the immigration consequence of a guilty plea and that such misadvice was determinative. *U.S. v. Lee*, Civ. No. 10-02698-JTF-dkv, Crim. No. 09-20011, 2013 WL 8116841, at *2 (W.D. Tenn. Aug. 6, 2013), *adopted in part and rejected in part by* 2014 WL 1260388, at *3 (W.D. Tenn. Mar. 20, 2014). The magistrate court read *Padilla* and *Chaidez* in almost the same way that we do.[6] The federal district court adopted the magistrate court's recommendation regarding the no advice and misadvice distinction. *Lee*, 2014 WL 1260388, at *9. That holding was not appealed, and the federal appellate court affirmed the district court's denial of relief. 825 F.3d 311, 316.

In reversing the federal appellate court, the Supreme Court does not mention *Chaidez* and the non-retroactivity of the rule in *Padilla*. —— U.S. ——, 137 S.Ct. 1958, 198 L.Ed.2d 476 (2017). Instead, it references *Strickland* throughout the opinion, and writes in one of the concluding paragraphs that, "Lee's claim that he would not have accepted a plea had he known it would lead to deportation is backed by substantial and uncontroverted evidence." *Id.* at 1969. The Court concludes that "Lee has demonstrated a reasonable probability that, but for [his] counsel's errors, he would not have pleaded guilty and would have insisted on going to

---

6. Specifically, the magistrate court wrote,
The "new rule" identified by the Court in *Chaidez* as having been announced in *Padilla* is one that speaks to the attorney's obligation to act (specifically, to advise). However, if, as Lee suggests, there was a rule in place at the time of his conviction that spoke not to the obligation to act, but rather to the obligation to, once choosing to act, do so competently by rendering accurate advice then, according to the Court's opinion in *Chaidez*, that rule is "separate" from and undisturbed by the *Padilla* rule. Such a "separate rule" lives in harmony with a pre-*Padilla* and post-*Padilla* world. Now, instead of limiting ineffective-assistance claims in this context to cases of affirmative misadvice, courts post-*Padilla* recognize such claims based on failure to advise as well. Thus, to the extent Lee's claim relies on a "separate rule" for affirmative misadvice in place at the time of his conviction, the fact that *Padilla* is not retroactive is inconsequential to Lee's case.
*U.S. v. Lee*, Civ. No. 10-02698-JTF-dkv, Crim. No. 09-20011, 2013 WL 8116841, at *8 (W.D. Tenn. Aug. 6, 2013), *adopted in part and rejected in part by* 2014 WL 1260388, at *3 (W.D. Tenn. Mar. 20, 2014).

trial." *Id.* (internal quotations and citation omitted). Had the Supreme Court viewed Lee's misadvice claim as being barred by the non-retroactivity of *Padilla*'s rule, it could have denied the writ.

After a careful reading, *Padilla* was a case about misadvice that produced a new rule regarding failure to advise. In other words, *Padilla*'s rule regarding failure to advise is a broad "new rule" that encompassed a well-recognized standard—an effective counsel may not affirmatively misadvise a client concerning immigration consequences. A reading of *Chaidez*'s holding that the "new rule" articulated by *Padilla* encompasses its misadvice factual roots is simply too simplistic. Given this perspective, a *Teague* retroactivity analysis is unnecessary because the misadvice rule was not "new." [7]

### G. The trial court did not abuse its discretion in granting habeas relief.

■■■ The burden is on the habeas corpus applicant to prove his claims by a preponderance of the evidence. *Ex parte Martinez*, 330 S.W.3d 891, 901 (Tex. Crim. App. 2011); *Ex parte Richardson*, 70 S.W.3d 865, 870 (Tex. Crim. App. 2002). The habeas court is the sole finder of fact in an Article 11.072 habeas case. *Ex parte*

*Garcia*, 353 S.W.3d 785, 788 (Tex. Crim. App. 2011).

■■■ When reviewing a habeas court's decision to grant or deny habeas relief in an Article 11.072 habeas case, we apply the highly deferential *Guzman v. State*, 955 S.W.2d 85, 89 (Tex. Crim. App. 1997), standard of review. *State v. Guerrero*, 400 S.W.3d 576, 583 (Tex. Crim. App. 2013); *Ex parte Garcia*, 353 S.W.3d at 788. Under this standard, we afford almost total deference to the habeas court's findings of historical fact that are supported by the record. *Ex parte Amezquita*, 223 S.W.3d 363, 367 (Tex. Crim. App. 2006). Likewise, we will defer to the habeas court's rulings on "application of law to fact questions" if the resolution of those ultimate questions turns on an evaluation of credibility and demeanor. *Ex parte Peterson*, 117 S.W.3d 804, 819 (Tex. Crim. App. 2003), *overruled in part on other grounds by Ex parte Lewis*, 219 S.W.3d 335 (Tex. Crim. App. 2007). On the other hand, if the resolution of the ultimate question turns on an application of legal standards absent any credibility issue, we review the determination de novo. *Ex parte Peterson*, 117 S.W.3d at 819.

The State's preserved arguments do not assail the findings of fact,[8] which evidence

---

7. We are aware that in *Ex Parte Martinez*, No. 13-10-00391-CR, 2013 WL 2949546, at *3 (Tex. App.—Corpus Christi Jun. 13, 2013, no pet.) (mem. op. on remand, not designated for publication) we held "applying pre-*Padilla* law as we must, we conclude that counsel's advice to [the habeas applicant] that he *could* be deported if he pleaded guilty, when the actual consequence was automatic deportation, does not constitute ineffective assistance of counsel." (emphasis in original). The argument raised and addressed in *Martinez* is different than the one in this case. The applicant in *Martinez* did not argue that there was a difference between affirmative misadvice and no advice. To the contrary, the applicant argued that "the trial court erred in denying his writ of habeas corpus because *Padilla v. Ken-*

tucky should apply retroactively...." *Id.* at *2. In other words, the applicant tied his success on appeal to *Padilla*. In fairness to the applicant, he did not have the benefit of *Chaidez*. The applicant's brief before this Court was filed on January 29, 2013, and *Chaidez* was decided on February 20, 2013. We issued our opinion on remand in *Martinez* on June 13, 2013, before *Padilla* and *Chaidez* were framed by the federal courts in *U.S. v. Castro-Taveras*, 841 F.3d 34 (1st Cir. 2016), *U.S. v. Chan*, 792 F.3d 1151 (9th Cir. 2015), and *Kovacs v. U.S.*, 744 F.3d 44 (2nd Cir. 2014).

8. In its reply brief, the State asserts that Garcia admitted he knew he would be deported because he testified at one point, "I knew I was going to get deported, so I went on and

the habeas court's belief in the recollections of Garcia, Espinoza, and Marvin over trial counsel's testimony. Thus, the State is bound by the habeas court's findings that misadvice regarding immigration consequences was given and that such misadvice was consequential in Garcia's decision to accept the plea agreement. Perhaps recognizing this limitation, the State makes two predominately legal arguments.

First, it argues that there is no distinction between misadvice and failure to advise. Therefore, according to the State, *Chaidez* held that the rule articulated by *Padilla* is non-retroactive and bars Garcia from collaterally attacking his conviction. The State's first argument fails to appreciate the intricacies at play. As noted above, *Padilla*'s rule encompassed a well-recognized standard—an effective counsel may not affirmatively misadvise a client.

Next, the State makes a *Teague*-like argument and tries to use the collateral consequences distinction that *Chaidez* acknowledged was percolating in lower courts. It contends that "[a]t the time [Garcia's] case became final herein, precedent did not dictate that preclusion of an ineffective assistance claim was unreasonable when it arose from an attorney's material misrepresentation of a deportation

risk." At oral argument, the State elaborated that Texas courts "never allowed *Strickland* to be applied to collateral consequences."

▪ Under *Teague*, "a case announces a new rule if the result was not dictated by precedent existing at the time the defendant's conviction became final." 489 U.S. at 302, 109 S.Ct. 1060. Even if we indulged the State and looked for existing precedent, the State fails to refer us to any opinion—from Texas or elsewhere and from 2002 or before—that holds a defendant may not assert an ineffective assistance of counsel claim based on affirmative misadvice regarding immigration consequences because immigration consequences are "collateral." [9] Neither Justice Alito when he concurred in *Padilla* nor this Court has found any such opinion. 559 U.S. at 385, 130 S.Ct. 1473 (J. Alito, concurring) ("[I]t appears that no court of appeals holds that affirmative misadvice concerning collateral consequences in general and removal in particular can *never* give rise to ineffective assistance.") (emphasis in original). In other words, as for misadvice, *Padilla* did not announce a new rule. In 2002, when Garcia pleaded guilty, criminal defense attorneys were expected

i—I reported for, like seven to eight months; doing good on my probation." The State waived this argument by failing to present it in its initial brief. *See* Tex. R. App. P. 38.3 ("The appellant may file a reply brief addressing any matter in the appellee's brief."); *see also Lopez v. Montemayor*, 131 S.W.3d 54, 61 (Tex. App.—San Antonio 2003, pet. denied).

Even if the issue were properly before us, it would still fail. The habeas court's factual findings provide that "If Applicant had not been affirmatively misadvised, he would not have pled guilty." As the judge of a witness's credibility and demeanor, the habeas court may have viewed the snippet of Garcia's testimony referenced by the State as a misstatement. *Ex parte Peterson*, 117 S.W.3d 804, 819 (Tex. Crim. App. 2003), *overruled in part on*

other grounds by *Ex parte Lewis*, 219 S.W.3d 335 (Tex. Crim. App. 2007); *see also In re H.S.V.*, No. 04-12-00150-CV, 2012 WL 3597211 at *4 (Tex. App.—San Antonio Aug. 22, 2012, pet. denied) (mem. op.) (providing that a trial court, siting as the factfinder in a case, may have found any misstatements or contradictions in a witness's testimony to be minor errors).

9. The closest the State comes is *State v. Jimenez*, 987 S.W.2d 886, 887 (Tex. Crim. App. 1999), a case dealing with no advice. *Id.* ("Appellee filed an application for writ of habeas corpus, alleging that her guilty plea was involuntary because she **had not been admonished** that she could be deported as a result of her pleading guilty.") (emphasis added).

to not hold themselves out as experts in areas where they were not.

We overrule the State's first issue.

### III. LACHES

In the State's second issue, it alternatively argues that "the trial court erred in failing to address the issue of laches." The State further argues that "there is nothing in the trial record, other than the length of delay, from which to ascertain whether laches has been proved." It contends that under *Ex Parte Bowman (II)*, 447 S.W.3d 887 (Tex. Crim. App. 2014) (per curiam),[10] "the proper course of action in such situation is to remand to the trial court for a hearing on the laches issue."

### A. The standard of review regarding laches is governed by the general framework for all habeas issues.

█ We will continue to apply the highly deferential *Guzman*, 955 S.W.2d at 89, standard of review to the issue of laches. Laches is a question of fact and, in proceedings governed by article 11.072, the trial court is the sole finder of fact. *Bowman*, 447 S.W.3d at 888.

### B. The question of laches is governed by equitable considerations.

Over the past four years, the court of criminal appeals has altered the rules governing laches in habeas proceedings. An overview of the three cases effectuating this change—*Perez*, *Smith*, and *Bowman (II)*—is helpful to understanding our disposition.

### 1. From the Federal Standard to the Common Law

█ In *Ex Parte Perez*, the court of criminal appeals replaced the federal standard for analyzing laches, which Texas courts had followed, with a "common-law standard" that "better comports with equitable considerations." 398 S.W.3d 206, 215 (Tex. Crim. App. 2013). The court explained that the defense of laches "typically requires proof by a preponderance of the evidence of two elements: unreasonable delay by the opposing party and prejudice resulting from the delay." *Id.* at 210 n.3 (citing *Caldwell v. Barnes*, 975 S.W.2d 535, 538 (Tex. 1998)). Thus, the defense of laches will bar habeas corpus relief "when an applicant's unreasonable delay has prejudiced the State, thereby rendering consideration of his claim inequitable." *Id.* at 219 (citing *Ex parte Carrio*, 992 S.W.2d 486, 487 (Tex. Crim. App. 1999)).

### 2. Sua sponte review by a habeas court

In *Ex Parte Smith*, a habeas court recommended to the court of criminal appeals that the applicant be permitted to file an out-of-time appeal under article 11.07. 444 S.W.3d 661, 664 (Tex. Crim. App. 2014). Even though the State neglected to plead laches and present any evidence of it, the court of criminal appeals held that a habeas court "may *sua sponte* consider and determine whether laches should bar relief." *Id.* at 667. It abated the proceeding and remanded for findings of fact and conclusions of law on the issue.

### 3. An Opportunity to Follow *Perez*

10. The *Bowman* habeas proceeding has thus far spawned three appellate opinions. The initial opinion came from the First Court of Appeals. *See Ex Parte Bowman(I)*, 444 S.W.3d 272, 278 (Tex. App.—Houston [1st Dist.] 2014), *rev'd by* 447 S.W.3d 887 (Tex. Crim. App. 2014) (per curiam). The second came

from the court of criminal appeals. *See Bowman (II)*, 447 S.W.3d 887, 888 (Tex. Crim. App. 2014). The third, came from the First Court of Appeals on remand. *See Bowman (III)*, 483 S.W.3d 726, 737 (Tex. App.—Houston [1st Dist.] 2016, pet. filed) (op. on remand)

In *Ex Parte Bowman (II)*, 447 S.W.3d at 888, the State raised the issue of laches for the first time on appeal. The First Court of Appeals rejected the State's defense of laches on, among other grounds, lack of preservation. *Id.* Relying on *Smith*, the court of criminal appeals held that the laches argument was not waived and that when the record is silent as to laches, the proper course of action is to remand to the habeas court for a hearing on the laches issue.

### 4. The Current Standard

 In determining the issue of laches in habeas corpus proceedings, habeas courts are to consider the totality of the circumstances, i.e., "factors such as the length of the applicant's delay in filing the application, the reasons for the delay, and the degree and type of prejudice resulting from the delay." *Perez*, 398 S.W.3d at 217. In regard to prejudice, "a court may draw reasonable inferences from the circumstantial evidence to determine whether excessive delay has likely compromised the reliability of a retrial." *Id.* However, even if the State presents proof of prejudice, a court still "must then weigh that prejudice against any equitable considerations that militate in favor of granting habeas relief." *Id.*

 In regard to the degree of proof required, "the extent of the prejudice the State must show bears an inverse relation-ship to the length of the applicant's delay." *Id.* Thus, "the longer an applicant delays filing his application, and particularly when an applicant delays filing for much more than five years after conclusion of direct appeals, the less evidence the State must put forth in order to demonstrate prejudice." *Id.* at 217–18. Although a delay of more than five years "may generally be considered unreasonable in the absence of any justification for the delay," the court of criminal appeals refused "to adopt a rebuttable presumption of prejudice to the State after [any] specified period of time." *Id.* at 210, 216 n.12. Thus, even in such instances, the State must still present *some* evidence of prejudice.[11]

In summing up its "expan[sion]" of the scope of the prejudice inquiry," the court of criminal appeals was careful to emphasize that it was "leav[ing] intact the equitable principles" that necessarily defeat the State's reliance upon the defense of laches when a record reveals:

- an applicant's delay was not unreasonable because it was due to a justifiable excuse or excusable neglect;
- the State would not be materially prejudiced as a result of the delay; or
- the applicant is entitled to equitable relief for other compelling reasons, such as new evidence that shows he is actually innocent of the offense or,

---

11. On remand, the First Court of Appeals again reversed the habeas court's denial of relief. *Ex Parte Bowman (III)*, 483 S.W.3d at 737 (citing 398 S.W.3d at 210, 216 n.12). It noted that *Perez*, expressly refused "to adopt a rebuttable presumption of prejudice to the State after [any] specified period of time." *Id.* The court of criminal appeals explained that "the longer an applicant delays filing his application, and particularly when an applicant delays filing for much more than five years after conclusion of direct appeals, *the less evidence the State* must put forth in order to demonstrate prejudice." *Ex Parte Perez*, 398 S.W.3d 206, 217–18 (Tex. Crim. App. 2013) (emphasis added). However, the State, in asserting the defense of laches must necessarily present *some* evidence of material prejudice actually caused by an unreasonable delay. *Id.* at 219 ("Though proof of mere passage of time will continue to be insufficient to raise laches, we will weigh all relevant equitable considerations in determining whether a long-delayed application for post-conviction relief should be barred by laches.").

in some cases, that he is reasonably likely to prevail on the merits.

*Id.* at 218 (citing *Ex parte Blue*, 230 S.W.3d 151, 170 (Tex. Crim. App. 2007) (Keller, P.J., concurring) (explaining that courts possess "equitable discretion" to ensure "federal constitutional errors do not result in the incarceration of innocent persons") (quoting *Herrera v. Collins*, 506 U.S. 390, 404–05, 113 S.Ct. 853, 122 L.Ed.2d 203 (1993)); *Ex parte Scott*, 190 S.W.3d 672, 675 (Tex. Crim. App. 2006) (Cochran, J., concurring) (suggesting equitable relief was warranted notwithstanding applicant's delay in seeking habeas corpus relief where applicant showed that the court of appeals wrongly affirmed his conviction)).

## C. The habeas court did not abuse its discretion in rejecting the State's defense of laches.

After *Perez*, *Smith*, *Bowman (I)*, 444 S.W.3d at 278 (Tex. App.—Houston [1st Dist.] 2014), *rev'd by* 447 S.W.3d 887 (Tex. Crim. App. 2014), and *Bowman (II)*, a panel of this Court reversed the habeas court's summary denial of relief and remanded for further proceedings. *Garcia*, 2016 WL 454997, at *4. We remanded to the habeas court "to allow [it] to conduct further proceedings it deem[ed] necessary to provide us with an adequate record." *Id.* at *3. We also expressly provided that nothing in our opinion "preclude[d] the State from re-urging any of its arguments made in its response to Garcia's habeas application." *Id.* at *3 n.2. Garcia amended his application for habeas relief; the State did not amend its written response. The habeas court held an evidentiary hearing. At that hearing, the State presented no evidence regarding material prejudice even though *Perez*, a case the State briefed in its initial written response, held that the mere passage of time alone was insufficient to raise the defense of laches and burdened the State to present *some*

evidence of material prejudice actually caused by an unreasonable delay. *Perez*, 398 S.W.3d at 219. The order granting habeas relief does not mention laches, and the State neither objected to the order nor requested additional findings and conclusions.

The State argues that it either did not or could not waive laches, contending that in *Bowman (II)*, the court of criminal appeals "noted that the issue of laches is not waived, even if the State fails to plead laches in the trial court." 447 S.W.3d at 888. But *Bowman (II)* is distinguishable. The *Bowman* applicant first moved for habeas relief sometime after April 2013 and the First Court of Appeals finally decided the initial appeal in August 2014. 444 S.W.3d at 276, *rev'd by* 447 S.W.3d 887. Both events pre-date the court of criminal appeals' decision in *Smith* instructing habeas courts to sua sponte consider the issue of laches. *Smith*, 444 S.W.3d 661. Contrary to the State's belief, the court of criminal appeals' decision in *Bowman (II)* did not exempt the State from basic error preservation. Instead, it implicitly gave retroactive effect to *Smith*.

 . The discretion *Smith* vests in habeas courts to sua sponte consider laches is instructive on the issue of waiver surrounding the State's assertion of laches in this case. *Id.* at 668. Under *Smith*, habeas courts have discretion to "consider sua sponte the interests of the judicial system and society generally." *Id.* "In a sua sponte laches inquiry, a court may excuse an applicant's delay when the record demonstrates that his delay was the result of justifiable excuse or excusable neglect based on the totality of circumstances. . . ." *Id.* If a habeas court has discretion to excuse an applicant's pre-litigation delay, it also has discretion to weigh dereliction by any party, including the State, that occurs after a habeas application is filed. To hold otherwise would

mean that a habeas court's "sua sponte discretion" may only be exercised to benefit the State.

■ We conclude that the habeas court rejected the State's laches defense. Unlike in *Bowman (I)*[12] and *Smith*,[13] the State pleaded laches in this case. After our request for an "adequate record" and our admonishment that the State was free to re-urge any of its arguments made in its response to Garcia's habeas application, the habeas court ordered an evidentiary hearing. From the order granting relief,[14] the habeas court was likely mindful that the State had since June 2014, when it first pleaded laches, to gather any evidence on the issue. The State did not mention laches at the hearing, and it did not seek a continuance. The State's failure to present any evidence on laches may have been viewed by the habeas court as waiver. *Cf. Perez*, 398 S.W.3d at 210 (declining to adopt a rebuttable presumption regarding laches). Furthermore, given that laches is largely governed by equitable principles, *see id.* at 218, and that habeas courts enjoy sua sponte discretion in considering the issue of laches, *Smith*, 444 S.W.3d at 668, we cannot say that the habeas court abused its discretion in rejecting the State's laches defense.

Lastly, practical considerations further support our conclusion that the habeas court did not abuse its discretion is finding waiver on the State's part and support our decision to decline the State's request to return Garcia's application to the habeas court for a second evidentiary hearing. Permitting such a return would needlessly consume judicial resources—on the habeas court and potentially this Court should a third appeal materialize—and incentivize gamesmanship by allowing the State to reserve the laches issue as an automatic reversal in case habeas relief is granted. Both parties should be encouraged to present all of their evidence to the habeas court through the adversarial process as efficiently as possible.

We overrule the State's second issue.

## IV. CONCLUSION

We affirm the judgment of the habeas court.

---

12. 444 S.W.3d at 278 ("Here, the State did not plead or otherwise assert the doctrine of laches in the trial court as a bar to appellant's requested habeas relief."), *rev'd by* 447 S.W.3d 887.

13. *Ex Parte Smith*, 444 S.W.3d 661, 664 (Tex. Crim. App. 2014) ("The State's answer did not plead laches or any theory of the case beyond a general denial.").

14. The order that granted relief in this case provides that the habeas court considered, among other things, "the State's response," which included the defense of laches.